IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TENNESSEE

FILED

MAY 0 4 2010

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

(UNDER SEAL),  )
              )
    Plaintiff,  )
              )   Civil Action No. 3 10 -CV-204
v.            )   Jordan | Shirley
              )
(UNDER SEAL),  )
              )
    Defendants.  )

## FALSE CLAIMS ACT COMPLAINT

# [FILED UNDER SEAL]

David A. Burkhalter, II, BPR # 004771
**BURKHALTER, RAYSON & ASSOCIATES, P.C.**
Attorney for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901-2777
(865) 524-4974

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex. rel. PATRICK GRIFFIS, AND<br>PATRICK GRIFFIS, INDIVIDUALLY,<br><br>    Plaintiff,<br><br>v.<br><br>EOD TECHNOLOGY, INC., AND<br>JOHN DOES, 1 THROUGH 5,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)      Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>) |

## FALSE CLAIMS ACT COMPLAINT

Relator, Patrick Griffis, by his undersigned attorneys and on behalf of the United States of America, and Patrick Griffis, individually, hereby sues the Defendant pursuant to 31 U.S.C. § 3729, *et. seq.*, and in support thereof, would show unto this Honorable Court as follows, to-wit:

TABLE OF CONTENTS

I.      NATURE OF THE CASE ..................................................................................p. 3

II.     JURISDICTION AND VENUE ........................................................................p. 3

III.    SUMMARY OF ALLEGATIONS ....................................................................p. 4

IV.     THE PARTIES...................................................................................................p. 10

        A.      About the Relator .................................................................................p. 10

        B.      About the Defendant.............................................................................p. 13

1

V.  SUBSTANTIVE ALLEGATIONS ............................................................p. 23

    A.  In General ............................................................................p. 23

    B.  Federal Travel Regulations (FTR) and Federal Acquisition Regulations (FAR and DFAR) Travel "Reimbursement" Improprieties: ............................p. 28

        1.)  Fraudulent Lodging Expenses/Reimbursement/Billings ...............p. 28

        2.)  Fraudulent Travel Expenses/Reimbursement/Billings ...............p. 46

        3.)  General and Administrative Charges Assessed to Fraudulent Traveling Expenses/Billings ............................................................p. 50

    C.  Excessive and Arbitrary Material and Handling Charges Billed in Violation of FAR/DFAR ............................................................p. 51

    D.  Potential Bribes/Inappropriate Billings to the U.S. Government/False Certifications ............................................................p. 57

        1.)  Mysterious/Questionable Payments Made to Get Access to Royalty in Saudi Arabia............................................................p. 57

        2.)  Potential Bribe Paid to Settle Tax Liability/Obtain License in Afghanistan ............................................................p. 60

        3.)  Other Financial Issues/Discrepancies/Improper Charges/Billings.........p. 65

            a.)  Missing Funds............................................................p. 65

            b.)  Working at Risk and Billing the U.S. Improperly ...............p. 65

            c.)  Violation of 41 U.S.C. 923(b) and "Show Cause Letter" of Potential Debarment............................................................p. 66

            d.)  Allegations Raised in Patton v. EOD Technology, Inc. (These Concern Potential Violations of Federal Laws and Regulations and Which Corroborate Improper Payments, Overcharging, False Certifications Previously Mentioned by Relator........................p. 67

    E.  GSA - Failure to Charge U.S. Lowest Price/Best Price Violations ...............p. 70

2

COUNT ONE..................................................................................................p. 73

COUNT TWO..................................................................................................p. 73

COUNT THREE..............................................................................................p. 74

COUNT FOUR................................................................................................p. 74

COUNT FIVE..................................................................................................p. 75

COUNT SIX....................................................................................................p. 75

COUNT SEVEN.............................................................................................p. 75

COUNT EIGHT (GRIFFIS' WRONGFUL DISCHARGE).........................p. 76

PRAYER FOR RELIEF..................................................................................p. 77

CERTIFICATE OF SERVICE......................................................................p. 79

## I.     NATURE OF THE CASE

1.    This case is brought by the Relator under the qui tam provisions of the United States False Claims Act, 31 U.S.C. § 3729, *et. seq.* (FCA).

2.    The False Claims Act provides, inter alia, that any person who knowingly, or acting with reckless disregard or deliberate ignorance, submits a false or fraudulent claim to the federal government for payment or approval is liable to the Government for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each claim, plus three times the amount of the false claim. 31 U.S.C. § 3729(a).

## II.     JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

3

1331 (Federal question), 28 U.S.C. § 1345 (United States as Plaintiff), and 31 U.S.C. § 3729-3733 (False Claims Act).

4.     In addition, to promote judicial efficiency, this Court may exercise supplemental jurisdiction over claims under Tennessee common law pursuant to 28 U.S.C. 3732(b) and 28 U.S.C. 1367(a), in that all state created claims pleaded or that may be pleaded in this case arise out of a common nucleus of operative facts.

5.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because it is located in and does business in the Northern District of Tennessee, and engaged in some of the conduct herein described in the Northern District of Tennessee, and otherwise resides in this District.

6.     Venue lies within the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because the acts and practices alleged in this Complaint occurred in this District.

### III.     SUMMARY OF ALLEGATIONS

7.     This case is brought by the Relator under the qui tam provisions of the United States False Claims Act, 31 U.S.C. § 3729, *et. seq.* (FCA).  The False Claims Act provides, inter alia, that any person who knowingly, or acting with reckless disregard or deliberate ignorance, submits a false or fraudulent claim to the Federal Government for payment or approval is liable to the Government for a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00), and not more than Eleven Thousand Dollars ($11,000.00) for each claim, plus three times the amount of the false claim.  31 U.S.C. § 3729(a).

4

8. The Relator, Patrick Griffis, has also brought an individual claim against the Defendant, EOD Technology, Inc., for wrongful discharge pursuant to 31 U.S.C. § 3730(h), Tennessee Common Law for termination in violation of Public Policy, and pursuant to Tennessee Code Annotated § 50-1-304 since he was fired after he began objecting to and trying to correct the illegal practices discussed herein, and after he began gathering evidence with respect thereto.

9. At all times material hereto, EOD Technology, Inc. was obligated to obey all the federal laws and regulations governing contractual relationships with the United States, including the provisions of the Defense Acquisition Regulations ("DFARS"), 48 C.F.R. § 201.104, *et. seq.*, the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1.000, *et. seq.*, the Cost Accounting Standards ("CAS"), 4 C.F.R. § 301.1, *et. seq.*, and the Federal Travel Regulations ("FTR"), 41 C.F.R. §§ 300, *et. seq.* Additionally, Defendant periodically certified its compliance with the aforesaid regulations, it periodically certified that the costs and charges contained on its invoices were "accurate" and were "reasonable, allocable and allowable," and further, it is contractually bound to abide by such laws and regulations. Defendant has knowingly made false certifications as herein alleged. These certifications constitute false statements made to get false or fraudulent claims paid under 31 U.S.C. § 3729 (a) (2), and the invoices also constitute false statements made to get false or fraudulent claims paid under 31 U.S.C. § 3729 (a) (2).

The above laws and regulations also required that EOD Technology, Inc. to retain documents relating to cost data so that the accuracy of such data could be verified by audit by the United States and its departments and agencies, including, but not limited to, the Defense Contract Audit Agency ("DCAA").

5

10.     Defendant's Munitions Response Business Unit has been awarded and has performed numerous Task Orders issued by the Department of the Army U.S. Army Corps of Engineers, Huntsville, pursuant to Contract Number W912DY-04-D-0018 ("the 018 Contract"). Over the past five (5) years, Defendant has been paid over One Billion Dollars ($1,000,000,000.00) on the 018 contract, alone. (*See*, attached as Exh. 1 a listing of Task Orders awarded to EODT on 018 Contract, and *See*, attached as Exh. 2 Open Obligation Report for Task Orders awarded to EODT). Over this same time period, Defendant has received Four Hundred Million Dollars ($400,000,000.00), plus performing various other contracts awarded by the U.S. Government as both a prime and as a subcontractor. Nearly all of the U.S. Army Corps of Engineers' Task Orders contain a combination of fixed price as well as time and material contract line items.

11.     The Relator alleges that EOD Technology has knowingly engaged in the systematic and longstanding practice of fraudulent billings to the U.S. Government as follows:

A.)     The Relator discovered this practice while he was Finance Director in Defendant's Munitions Response Business Unit. Defendant has routinely violated the provisions of FTR, FAR, and DFAR and the terms of its contractual obligations with the U.S. Government by its allowing employees/subcontractors to profit from travel by allowing employees/subcontractors to be "reimbursed" for non-existent lodging expenses at the highest rates allowed by FTR, when in fact, they incur no such expenses, and when in fact they submit no receipts or invoices to verify the expenses as required by FTR, but instead, they stay in travel trailers, campers, RV's, and/or motor homes. However, after Relator began challenging this practice, he began receiving falsified receipts. Defendant, with full knowledge of the fact the lodging expenses are <u>not</u> being incurred, have

6

"reimbursed" its field employees/subcontractors for the bogus lodging expenses under the time and material contracts issued, primarily by the Department of the Army U.S. Army Corps of Engineers, and then submitted numerous fraudulent claims to the Department of the Army U.S. Army Corps of Engineers, seeking "reimbursement" of these lodging "expenses" as part of the contract task orders.

The Relator estimates the amount of fraud that has been perpetrated annually by the Defendant in connection with the submission of fraudulent lodging "reimbursement" requests to be approximately Six Million Seven Hundred Seventy Thousand Seven Hundred Fifty Dollars ($6,770,750.00) per year, plus or minus. Over the past six (6) years, it is estimated the amount of fraudulent claims attributed to this practice would be in the range of Forty Million Six Hundred Twenty-Four Thousand Five Hundred Dollars ($40,624,500.00), plus or minus.

B.)     In connection with the performance of the same Department of the Army U.S. Army Corps of Engineers Task Orders issued pursuant to the 018 contract, Relator discovered Defendant has also been "reimbursing" field employees/contractors for travel at inflated rates in knowing violation of FTR/FAR and in violation of its contractual obligations with the Department of the Army U.S. Army Corps of Engineers. Defendant, thereafter, submits false and fraudulent claims to the Department of the Army U.S. Army Corps of Engineers seeking reimbursement of these inflated travel claims.

Defendant "reimburses" field employees/subcontractors for travel using one way airline tickets/rates multiplied by two (2) instead of using round trip ticket/rates as required by the FTR. The Relator very conservatively estimates that this has resulted in fraudulent excessive payments received by EODT from the U.S. Government in Defendant's Munitions Response Business Unit

7

alone of Four Hundred and Twenty Six Thousand, Four Hundred Dollars ($426,400) per year, but believes the actual amount is much more. Over the past six (6) years, it is estimated that this fraudulent practice has resulted in EODT receiving in excess of Two Million, Five Hundred and Fifty Eight Thousand Four Hundred Dollars ($2,558,400) in fraudulent payments.

C). Defendant has also from time to time assessed general and administrative charges on top of the fraudulent lodging and travel "reimbursements" mentioned in A.) and B.) above. This practice substantially increases the amount of fraudulent charges billed to the Government and paid by the Government due to the bogus lodging and travel expenses, but Relator does not think G&A charges were assessed on every 018 Task Order. It is estimated that the amount of general and administrative fees assessed on top of fraudulent lodging and travel charges would be approximately Two Million One Hundred Three Thousand Seven Dollars ($2,103,007.00) per year. Over the past six (6) years, this would total in the range of Twelve Million Six Hundred Eighteen Thousand Forty Two Dollars ($12,618,042.00).

D.) Another area of false claims contained in the Complaint includes Defendant's practice of bidding and charging arbitrary material handling charges on its Government contracts in violation of FAR. During his employment, Relator discovered and questioned Defendant's practice of adding an arbitrary "material handling" charge to its time and material Munitions Response (MR) invoices to the Department of the Army U.S. Army Corps of Engineers of seven point five percent (7.5%), when the Defendant's financial statements indicated that the actual material handling amount should have been more in the range of two point five percent (2.5%) to two point nine percent (2.9%). This arbitrary material handling charge would be buried in the bid and not apparent in the bills submitted

8

to the U.S. Government, but this practice clearly violates FAR. Relator could not get a good explanation of this other than the fact that this has been Defendant's standard practice for numerous years, and has resulted in profitable overpayments. In meetings Relator attended, it was acknowledged that this practice was wrong, but there was no indication the monies would be refunded or that the practice would cease. However, such a practice violates FAR and Defendant's contractual obligations with the U.S. Army Corps of Engineers.

On Government contracts, the Relator would estimate that the amount of fraudulent billings attributable to the "Material Handling" over charges would be in the range of Five Hundred Fifty-Two Thousand Dollars ($552,000.00) per year. Over the past six (6) years, this would be in the approximate range of Three Million Three Hundred Twelve Thousand Dollars ($3,312,000.00).

E.) Potential Bribes/Inappropriate Billings to the U.S. Government/False Certifications. During his employment, the Relator discovered other improper illegal behavior, including potential bribes being made to foreign nationals.

F.) GSA – Failure to Charge U.S. Lowest Price on Commercial Sales of Green Targets. Defendant sells "green targets" to the U.S. Government. This is an ever growing part of its business, with current sales in the range of Six Million Dollars ($6,000,000.00) a year. Relator discovered Defendant did not have a uniform price sheet and that it has failed to sell its green targets to the U.S. Government at the lowest price while certifying to the Government otherwise. The Relator would estimate the amount the U.S. has been overpaying for green targets would be, approximately One Hundred Thousand Dollars ($100,000.00) per year.

G.) Relator Griffis has also sued EODT individually for wrongful discharge since he was

9

fired after he began protesting the illegal practices and after he began gathering evidence with respect thereto.

## IV.    THE PARTIES

### A.    The Relator, Patrick Griffis

12.    The Relator's, date of birth is March 27, 1973. He is a former employee of the Defendant, EOD Technology, Inc. ("EODT"). He was hired as Finance Director of Defendant's Munitions Response Business Unit. His first day on the job was August 17, 2009, and he was fired on February 18, 2010, in retaliation for refusing to ignore the illegal business practices, but instead, trying to correct them, and after he was gathering evidence with respect thereto. The reason stated by EODT for Relator's termination was "Failure to Meet Job Requirements".

13.    The Relator currently resides in Knoxville, Tennessee, is married, and has two children and one step child. The Relator served in the United States Army, at Fort Bragg, North Carolina as a Military Police Investigator from 1992 until December of 1996. The Relator then went back to college and received a B.S. degree in 1999, in Accounting and International Business at the University of Cincinnati. While in college, he also worked as an Accountant at the Kroger Company in Cincinnati, at the corporate headquarters, and he went to the U.S. Army Reserves Officer Candidate Training School where he graduated in the top five of his class in 1998. While in college, he was also commissioned by the Ohio National Guard and was appointed Second Lieutenant of the 324th Military Police Company in Middletown, Ohio, and he stayed in the National Guard for two (2) years as an Executive Officer. On November 16, 2001, he was activated by the Air Guard, and he completed a tour of duty supporting Operation Enduring Freedom after 9/11. Relator served in

10

the Air Guard as a Security Police Officer with the Air Force from November 16, 2001 until July 15, 2002, at Rickenbacker Air National Guard Base in Columbus, Ohio. In August of 2002, he resigned his commission to go to graduate school at Thomas More College to pursue an MBA, which he received in August, 2002.

14. From January of 2001 until August of 2002, the Relator worked for Coca Cola as an Analyst in the Office of Planning & Analysis in Cincinnati, Ohio. In August of 2002, he was hired by the U.S. Department of Homeland Security as Chief Administrative Officer of the Cincinnati Field Office. Thereafter, he was promoted to Assistant Director of Operations in Dayton, Ohio. He remained in this position until February of 2006, when he was transferred to the United States Environmental Protection Agency in Cincinnati, Ohio, as National Program Manager, where he served as the Travel and Relocation Division Chief until August of 2007. During his time with the Environmental Protection Agency, he ran the National Travel Program for the Environmental Protection Agency, and oversaw business travel, reimbursement and employee relocations, and he developed programs with respect thereto. Anytime anyone within the EPA traveled or relocated for EPA business purposes, their travel and reimbursements were managed by Relator's office.

15. While at the Environmental Protection Agency, the Relator obtained extensive knowledge of, and expertise in, interpreting and applying the Federal Travel Regulations ("FTR") and Federal Acquisition Regulations ("FAR"). While at the EPA, he developed programs that received positive recognition from the White House, the Office of Management and Budget, and the GSA Office of Government wide Policy. An article published in the Cincinnati Business Courier describes some of the Relator's accomplishments. The GSA awarded the EPA, the Agency

11

Innovation of the Year Award in 2008, predicated in part, on the Relator's work at the EPA between 2006 and 2007.

16.     In August of 2007, the Relator decided to return to the private sector, and he accepted a position at Relocation Management Worldwide, Inc. ("RMW, Inc.") in Memphis, Tennessee. While employed by Relocation Management Worldwide, Inc., he worked as Vice President of Government Operations, handling travel and relocation services for various Federal agencies. During this same time period, the Relator started his own consulting business called Mark Your Target. Mark Your Target holds a GSA Contract to provide instructional training services on GSA contracts. In this consulting role, Relator provides acquisition training, contract support, green purchasing training, green business operations training, and green transportation training. Some of his consulting customers have included: The GSA Federal Acquisition Service, The Department of Veterans Affairs, and The U.S. National Park Service. Mark Your Target is still an active business as of the present date.

17.     Relator stayed with Relocation RMW, Inc. until June of 2009, when he applied for a job at EODT. He was offered a job on July 28, 2009, and reported to work on August 17, 2009, in EODT's Munitions Response Business Unit as Finance Director. He remained at EODT until he was fired on February 18, 2010. At termination, EODT agreed to waive its claim to require Relator to repay Seventeen Thousand Dollars ($17,000.00) in "sign up bonuses" provided he signed a confidentiality agreement and release, which he declined to sign.

18.     During his employment with EODT, Relator reported to Lisa Jacobson, the CFO, and on a dotted line basis to, Matt Hulsey, who was the Vice President of Munitions Response. The

12

Relator was fired after he started raising objections and complaints concerning illegal business practices that resulted in significant over charges to the Federal Government, and he discovered other improprieties that had come to his attention. The Relator was trying to correct these illegal practices, but it became increasingly clear to the Relator that EODT did not wish to correct the practices. His relationship with his superiors continued to decline after he continued to express his concerns about illegal practices, and after he made it clear he would not go along with "business as usual." Shortly before his termination, the Relator requested a printer to be attached to his office computer so he could print documents related to a potential False Claims Act case, and the subject of False Claims Act cases in general, came up in a conversation. At the time of termination, the Relator did not own any EODT stock, and he was not eligible to receive stock until he had been there for a full year.

**B.      EOD Technology, Inc.**

19.      EOD Technology, Inc. ("EODT") was founded in 1987 and has its headquarters in Lenoir City, Loudon County, Tennessee.    The headquarters are located a few miles west of Knoxville, Tennessee and a few miles south of Oak Ridge, Tennessee.  EODT was ranked eighty-sixth (86th) on the list of top one hundred (100) defense contractors in 2008, but presently would be ranked higher on this list since it recently received significant Governmental contractual awards.  In or around 2008, EODT had four hundred and fifty (450) permanent employees and approximately three thousand (3,000) subcontractors.

20.      Although it bills itself as an "employee owned company," fifty-one percent (51%) of the company is owned by EODT Chairman, James Burger, and it is Relator's understanding that

13

other large chunks of stock are owned by other long term employees. Had the Relator not been terminated, the Relator would have been eligible to receive stock after one (1) year of employment.

21.     EODT is divided into three business units: Munitions Response ("M.R."), Security Services ("S.S."), and Critical Mission Support ("C.M.S."). EODT claims on its Web page that ninety percent (90%) of its current work is performed as a prime contractor. The company was basically built around Munitions Response and Munitions Response's primary customer is the Huntsville, U.S. Army Corps of Engineers with whom EODT has had a "continuous contractual relationship for more than ten (10) years." Recently, EODT received another five (5) year award under the USACE WWERS IDIQ Contract valued at nearly nine hundred and forty-five million dollars ($945,000,000.00). EODT's Munitions Response Business Unit has also performed work for the Army, Navy, the Air Force and the U.S. Marine Corps.

22.     EODT has undergone explosive growth in the recent past, sustaining a twenty (20) fold increase over the past five years "roughly equivalent to an eighty percent (80%) annual growth."

23.     Since EODT is a privately owned company, it is not possible to precisely state Defendant's revenue, but it is estimated that the revenues of EODT have been as follows:

a.)     2006: approximately One Hundred and Eighty-Six Million Dollars ($186,000,000.00).

b.)     2007: approximately Two Hundred Million Dollars ($200,000,000.00).

c.)     2008: approximately Four Hundred and Six Million Dollars ($406,000,000.00).

14

d.)     2009: approximately Four Hundred and Ninety-Five Million Dollars ($495,000,000.00).

e.)     The Defendant's five (5) year growth rate plan is to have One Billion Dollars ($1,000,000,000.00) in revenues, the vast majority of which would be funds received from the U.S. Government, on various contracts.

24.     The amount of the above-mentioned revenue attributable to Defendant's Munitions Response Business Unit fluctuates on a year-to-year basis. For example, in either 2006 or 2007, the revenue from Munitions Response was approximately One Hundred and Fifteen Million Dollars ($115,000,000.00), whereas the amount of revenue that closed in 2009 was approximately Thirty Million Dollars ($30,000,000.00). Prior to the Relator's termination, the Munitions Response budget in 2010 was One Hundred and Twenty-Two Million Dollars ($122,000,000.00).

25.     The amount of revenue generated by EODT's Munitions Response Business Unit has depended in the past on what the Department of the Army United States Army Corps of Engineers is doing domestically and the amount of Task Orders awarded to EODT with respect thereto. The primary customer of EODT's Munitions Response Business Unit has been the Department of the Army United States Army Corps of Engineers, Huntsville, but Defendant has also performed munitions response work for the Navy and Air Force. Unfortunately, over the duration of EODT's relationship with the U.S. Government, EODT has routinely over-billed and routinely submitted millions of dollars of False Claims. Although Relator worked in Defendant's Munitions Response Business Unit, the Relator has reason to believe that the fraudulent activities discussed herein are rampant on all Government contracts throughout all three of Defendant's business units.

15

26.     As previously stated, EODT's Munitions Response activities basically built EODT going back to 1987, which was primarily pursuant to its very profitable and longstanding relationship with the Huntsville, U.S. Army Corps of Engineers. The business of Munitions Response includes: range clean-up, ordinance disposal, environmental remediation and clean-up, under water Munitions Response, clearing unexploded ordinances, and it also has a green target business, which sells environmental friendly targets to Department of Defense ("DOD"), and to other customers. As part of its range clean-up process, EODT removes old trucks, old vehicles, old tanks, other targets, etc., and replaces the targets with recycled "green" targets, which it sells. These "green" targets do not leak fuel, oil, etc. Critical Mission Support includes IT services, food services, housing services, logistics support, transportation services, and some protective services work, primarily in Iraq and Afghanistan. Security Services provides uniformed security guards, not protective services, not like dignitary protection, but more guard post kind of positions.

27.     The Department of the Army U.S. Army Corps of Engineers Master Contract, contract number W912DY-04-D-0018 ("the 018 contract") was issued in or about 2004. However, there were previous Department of the Army U.S. Army Corps of Engineers' contracts, as well, that EODT benefited from, and EODT has had a longstanding and continuous relationship with the Department of the Army U.S. Army Corps of Engineers going back to 1987. The internal EODT accounting system project numbers are assigned systematically for the Department of the Army U.S. Army Corps of Engineers 018 contract and are listed in the 4xxx Series Project Numbers. The 018 contract was initially a five (5) year contract, and under this contract, the U.S. Corps of Engineers issued Task Orders for specific work to various companies, including EODT's Munitions Response

16

Business Unit. <u>EODT's Munitions Response Business Unit was paid approximately over One Billion Dollars ($1,000,000,000.00) during the past five (5) year period, pursuant to various Department of the Army U.S. Army Corps of Engineers' Task Orders alone</u>. Recently, EODT was awarded a Task Order by the U.S. Army Corps, pursuant to the 018 contract, for munitions clearance work in Afghanistan. Over the five (5) year term of the U.S. Forces Task Order, it was projected by EODT that this Task Order will generate between Sixty Million Dollars ($60,000,000.00) and One Hundred and Sixty Million Dollars ($160,000,000.00) for EODT.

28.     The Task Orders generally are competitively bid, and as will be stated hereinafter, this creates the incentive to bid low in order to be awarded the bid, but thereafter, to fraudulently submit charges under the time and materials component of the contracts to increase the overall revenue. Unfortunately, this has been the standard practice that EODT has employed in connection with the time and materials contracts, and as a result, EODT has submitted numerous fraudulent claims to the Government.

29.     The Department of the Army U.S. Army Corps of Engineers' master contract, 018, Task Orders, and the requests for proposals, describe the statement of work in great detail, and list any applicable Federal Laws and Regulations that must be followed, including the Federal Travel Regulations ("FTR"), 41 C.F.R. § 300-1.1, *et seq.*, the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1.000, *et seq.*, the Defense Acquisition Regulations ("DFARS"), 48 C.F.R. § 201.104, *et seq.*, Cost Accounting Standards ("CAS"), 48 C.F.R. § 301.1, *et seq.*, the Army FAR Supplement ("AFARS"), etc. Depending on what branch of the military was involved in the contracts, EODT Task Orders may also, for example, be required to comply with the Navy Acquisition Procedures

17

Supplement ("NAPS"), and the Air Force ("FAR") Supplement("AFFARS"). Typically, the Task Orders are hybrid models of time and material contracts/fixed price contracts. EODT has perfected methods of manipulating these Task Orders to bilk the Government.

30.     Generally speaking, work performed under the Department of the Army U.S. Army Corps of Engineers Task Orders typically lasts from sixty (60) to one hundred and eighty (180) days, and sometimes several years, depending on the scope of work. On these Task Orders, EODT could have anywhere from a hundred and twenty (120) employees in the field on locations in the U.S. assigned to perform the work, to over two hundred (200) people. EODT typically treats the people working in the field as employees. Under the 018 contract, some international Task Orders have also been awarded to EODT, including a Task Order for Iraq, which was awarded to EODT, which has hundreds of people on it. There is also a recent Task Order for work in Afghanistan that is going to have several hundred people working on it.

31.     Defendant's Munitions Response Business Unit has worked on approximately <u>seven hundred (700) projects in forty (40) states</u>, primarily pursuant to Task Orders issued by the Department of the Army U.S. Army Corps of Engineers. At or about the time of Relator's termination, there were twelve (12) Task Orders that Munitions Response was working on for the U.S. Army Corps of Engineers, Huntsville. Two (2) of these Task Orders were international (in Iraq and Afghanistan), and ten (10) were domestic. On the domestic side, EODT had approximately one hundred and twenty (120) people working in the field assigned to work on the domestic Task Orders at the time of Relator's termination. In a given year, EODT might work on sixty (60) to seventy (70) Task Orders, which would be in the range of approximately One Million Dollars

18

($1,000,000.00), each on the average. EDOT could be working on ten (10) or more Task Orders for the U.S. Army Corps of Engineers at any time, and paying (and billing the U.S. for) anywhere from eighty (80) field employees to two hundred and fifty (250) field employees on domestic jobs.

32.     Typically, there are several companies that have done work on contract 018 pursuant to various Task Orders issued over the years by the Department of the Army U.S. Army Corps of Engineers. Typically, the people in the field who do the work on these Task Orders, are highly trained and very specialized, and they will transition from one contractor to another contractor depending on which company was awarded the work in their preferred geographical areas. Sometimes, these same people travel from one worksite to another in their travel trailers while working for EODT.

33.     Relator, Finance Director of Munitions Response, prepared an organizational chart to help explain, primarily, the reporting structure of Defendant's Finance Department to indicate the various personnel and their job titles. There is also an EODT leadership list pulled from the Web that discusses EODT and some of their key employees. The organizational chart the Relator prepared shows how things work versus how things are on paper. The dotted blue lines are the indirect reporting structures. Lisa Jacobson is the Vice President and CFO. The Controller, Roger Rohtert, reported directly to her as did the Relator, and the two other Finance Directors at EODT, Anna Tilley, in Security Services and Kevin Beamish, in Critical Mission Support. The Controller informally functioned as Deputy CFO, and all three Financial Directors, on paper, reported to the Controller as well. Each of the Finance Directors, even though they report on a direct line to the CFO, they also report to the Vice President of their respective business units, and they each really

had two (2) masters, at all times. The Relator reported to Lisa Jacobson, CFO, and Matt Hulsey, Vice President of Munitions.

34. The "in-country" Finance Managers changed during the time that Relator was with EODT. Aaron (Unknown) was initially the "in-country" Finance Manager in Afghanistan, but he left in December, 2009 for Lenior City, and in or about December, 2009 Emmanuelle Obasiolu, a Nigerian became "in-country" Finance Manager in Afghanistan. During Relator's employment, there was a vacancy in the Finance Manager position in Iraq, but in or about January, 2010, Jim (Unknown) was hired as "in-country" Finance Manager in Iraq.

35. During his employment at EDOT, there were weekly Finance Staff Meetings on Thursdays from 9:00 a.m. to 11:00 a.m. Those attending the meetings would include, Lisa Jacobson, the CFO, and her direct reports, including the Relator, the other two Finance Directors, Kevin Beamish and Anna Tilley, Robert Rohtert, the Controller, as well as, the "in-country" Finance Managers in Iraq and Afghanistan, who would participate by teleconference, and Russ Katzman, the Director of Accounting Systems. The Treasurer, Kathy Lindsey, attended every meeting. During these meetings, minutes were taken by Joe (Unknown), and the minutes should be available pursuant to a subpoena.

36. During Relator's employment, there were also periodic Senior Management Meetings with respect to EODT's financial performance, and these meetings took place after EODT's books were closed each month. At these meetings, the President, Matt Kaye, would be in attendance, and also, James Burger, Chairman, and owner of fifty-one percent (51%) of EODT, attended a few of the meetings during Relator's employment. Russ Katzman, Director of Accounting Systems, and Lentyn

20

Myers, Assistant Controller would be at the meetings. Rick Lyons, Contract Director, who structured contracts, also attended these meetings, as well as, did the Relator and his counterparts in CMS and S.S. Relator does not believe that minutes were taken at these meetings, but monthly and annual reports were prepared and printed by Roger Rohtert's Accounting Office, and these included things discussed at these meetings, and these reports should also be available pursuant to subpoena.

37.     The person handling billing for EODT during the Relator's employment was Kim Henderson, job title A/R Manager-Munitions Response, who was in Accounts Receivable. The Accounts Receivable group would do the billing for all three business units. Ms. Henderson reported to Roger Rohtert, who in turn reported to Lisa Jacobson. EODT's bills are system generated and Henderson queries the data in the accounting system, and creates an invoice, and it is often billed electronically. Typically, she would first create an invoice and then submit it to the project manager for review and approval, prior to billing the Government.

38.     The Relator believes that as far as the Department of the Army United States Army Corps of Engineers invoices, that they require extensive detail on the invoices, because the bills are for time and material work predominately. Some of the Task Orders issued by the Department of the Army U.S. Army Corps of Engineers, however, are mixed: they have a small amount of firm fixed price contract line items, and a large amount of cost reimbursable line items (time and materials). The Department of the Army U.S. Army Corps of Engineers' Fort Benning Task Order, where Relator first became aware of the fraudulent lodging issues and travel issues, hereinafter discussed, was a combination of firm fixed price contract with a time and materials aspect. Typically, required reports, mobilization and demobilization are firm fixed, whereas, field work is T&M.

21

39.     EODT describes its "culture" in part as follows:

"(i)n basketball terms, we're a fast break oriented team. We grab and
run with opportunities that other firms would shrink from. We
understand risks and take decisive action. Literally, there is
something new and interesting that happens every day. The company
rewards both initiative and results and we all benefit as employee
owners."

40.     According to Relator, EODT also describes this approach as "leaning forward in the foxhole." This culture and EODT's admitted desire for astronomical financial growth derived from U.S. tax dollars, helps explain why EODT has the attitude that it can ignore clear contractual provisions and submit False Claims, and take risks that it will not get caught as it continues to submit millions of dollars in False Claims annually to the U.S. Government. Evidencing this attitude and business approach were numerous derogatory comments overheard by Relator about the U.S. Army Corps of Engineers personnel to the effect they were inept or incompetent. Relator learned that EODT personnel believed the Department of the Army U.S. Army Corps of Engineers (and other U.S. parties) were not concerned with what was billed or whether the regulations were followed, but were only concerned with whether the job got done.

41.     For obvious reasons, EODT has tried to foster and develop its relationship with the Department of the Army U.S. Army Corps of Engineers. For example, a former United States Army Corps of Engineers employee, Larry Seivers, went to work for EODT in or about two (2) years ago as a Business Development Director in Munitions Response. He works out of San Diego, California, and travels to U.S. offices/districts.

22

42.     EODT claims on its WEB page that it has undergone nine (9) Defense Contract Audit Agency ("DCAA") audits, but Relator does not think that any of these audits were full and complete audits. Full and complete audits should be done on all of the issues raised in Relator's Complaint. To Relator's knowledge, EODT has never been audited for lodging or travel expenses, or material and handling compliance. Given the culture of EODT and its low opinion of the vigilance of the U.S. Army Corps of Engineers (and other U.S. parties), Defendant considers the fraudulent practices alleged in the Complaint, to be "low risk" activities that will be continued due to the lucrative financial rewards received by EODT at taxpayers' expense.

## V.     SUBSTANTIVE ALLEGATIONS

**A.     In General:**

43.     Defendant's various U.S. Government contracts with EODT and the Task Orders incorporate, and/or require compliance with various U.S. laws and regulations, including FAR, FTR, and DFAR and regulations. The Time and Materials Task Orders have specific clauses governing allowable costs, including allowable material handling charges and allowable travel and lodging reimbursement costs (which must be consistent with FTR).

44.     General and administrative expenses ("G&A") are management, financial and other expenses which are incurred by or allocated to a business unit and which are for the general management and administration of the business as a whole. Pursuant to the CAS and generally accepted accounting principals, a "direct cost" is one that relates specifically to work on a particular contract or other "final cost objective." Direct costs must be charged directly to the relevant contract or final cost objective. Pursuant to the CAS and generally accepted accounting principals, an

23

"indirect cost" is one not directly identified with a single contract or other final cost objective. Examples are general and administrative costs and overhead costs, which are related to the performance of more than one contract or final cost objective.

45.    In carrying out its Federal contracts, EODT is required to comply with the Federal Acquisition Regulations ("FAR").   As provided in part in 10 U.S.C. § 2324:

Allowable costs under defense contracts

(a) Indirect Cost That Violates a FAR Cost Principle.—The head of an agency shall require that a covered contract provide that if the contractor submits to the agency a proposal for settlement of indirect costs incurred by the contractor for any period after such costs have been accrued <u>and if that proposal includes the submission of a cost which is unallowable because the cost violates a cost principle in the Federal Acquisition Regulation or applicable agency supplement to the Federal Acquisition Regulation, the cost shall be disallowed.</u>

(b) Penalty for Violation of Cost Principle.—(1) If the head of the agency determines that a cost submitted by a contractor in its proposal for settlement is expressly unallowable under a cost principle referred to in subsection (a) that defines the allowability of specific selected costs, the head of the agency shall assess a penalty against the contractor in an amount equal to—
(A)  the amount of the disallowed cost allocated to covered contracts for which a proposal for settlement of indirect costs has been submitted; plus
(B)   interest (to be computed based on provisions in the Federal Acquisition Regulation) to compensate the United States for the use of any funds which a contractor has been paid in excess of the amount to which the contractor was entitled.
. . .
(e) Specific Costs Not Allowable.—(1) The following costs are not allowable under a covered contract:
. . .
(D)  Payments of fines and penalties resulting from violations of, or failure to comply with, Federal, State, local, or

24

foreign laws and regulations, except when incurred as a result of compliance with specific terms and conditions of the contract of specific advance such payments in accordance with applicable provisions of the Federal Acquisition Regulation.

. . .

(h) Contractor Certification Required.—(1) A proposal for settlement of indirect costs applicable to a covered contract shall include a certification by an official of the contractor that, to the best of the certifying official's knowledge and belief, all indirect accosts included in the proposal are allowable. Any such certification shall be in a form prescribed in the Federal Acquisition Regulations.

(i) Penalties for Submission of Cost Known as Not Allowable.—The submission to an agency of a proposal for settlement of costs for any period after such costs have been accrued that includes a cost that is expressly specified by statute or regulation as being unallowable, with the knowledge that such cost is unallowable, shall be subject to the provisions of section 287 of title 18 and section 3729 of title 31.

(ii) Contractor To Have Burden of Proof.—in a proceeding before the Armed Services Board of Contract Appeals, the United States Court of Federal Claims, or any other Federal court in which the reasonableness of indirect costs for which a contractor seeks reimbursement from the Department of Defense is an issue, the burden of proof shall be upon the contractor to establish that those costs are reasonable.

46.    EODT makes periodic certifications to the U.S. Government as a condition of doing business with the U.S. Government. Its certifications include:

The following FAR clauses apply to this Contract if the value of this Contract exceeds $5,000,000 and the period of performance is more than 120 days:

(1) 52.203-13 Contractor Code of Business Ethics and Conduct

(2) 52-203-14 Display of Hotline Posters (applies regardless of performance period)

25

By signing a contract or performing against a contract in which FAR 52.203-13 is applicable:

The contractor hereby certifies that they will comply with all elements of FAR 52.203-13 including timely disclosure, in writing, to the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, and the cognizant ARINC Procurement Representative whenever, in connection with the award, performance, or closeout of this contract or any subcontract there under, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed -

(A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or

(B) A violation of the civil False Claims Act (31 U.S.C. 3729-3733).

The contractor also certifies that, within 30 days of signing a contract or performing against a contract in which FAR 52.203-13 is applicable, they will establish a written code of business ethics and conduct and will make a copy of the code available to each employee engaged in performance of the contract.

Defendant further periodically certifies that the costs/charges claimed on its invoices to the United States are "accurate" and "reasonable" and are "allocable" and are "allowable." Defendant has knowingly made false certifications as herein alleged. These certifications constitute false statements made to get false or fraudulent claims paid under 31 U.S.C. § 3729 (a) (2), and the invoices also constitute false statements made to get false or fraudulent claims paid under 31 U.S.C. § 3729 (a) (2).

47.    In Defendant's own Code of Business Ethics and Conduct, it provides in part:

Gifts to Foreign Public Officials
The Foreign Corrupt Practices Act ("FCPA") prohibits giving anything of value to a foreign official for the purpose of improperly influencing an official decision. It also prohibits unlawful political contributions to obtain or retain business overseas. The FCPA additionally prohibits the use of false records or accounts in the conduct of foreign business. It is also essential that EODT does not allow or condone international consultants to take any actions prohibited by the FCPA, as their

26

actions...

Contract Compliance
Employees must do everything practical to ensure compliance with EODT's contracts. EODT complies with all of the terms of our contracts...

Books, Records, and Accounts
Employees may never falsify any Company record.

EODT has a critical responsibility to accurately, fairly, and in reasonable detail reflect transactions and dispositions of assets in its books, records, and accounts. EODT may not make, for any reason, any false or misleading entries in its books and records (including tax returns). EODT may not establish or maintain any unrecorded fund or asset of the Company for any reason.

EODT depends on its employees involved in maintaining EODT's books, records, and accounts to help it meet this critical responsibility. Employees may not effect any transaction and no payment may be made on behalf of the Company with the intention or understanding that the transaction or payment is other than as described in the documentation evidencing the transaction supporting the payment.

. . .

4.    Business Practices
4.1    EODT and its employees will abide by the Foreign Corrupt Practices Act (FCPA, 15 U.S.C. §§ 78dd-1) which includes the prohibition of any offer, pay, promise to pay, to any Foreign Official for the purpose of influencing any act or decision, including a decision to fail to perform his lawful duty, or inducing such Foreign Official to use his influence with any Government or instrumentally thereof to affect or influence any act or decision to obtain or retain business for any Person or to gain an improper advantage.

4.2    EODT and its employees will employ high ethical standards so as to maintain procurement integrity at all times and with all parties, whether they are the U.S. Government, Competitor Relationships, or ensuring EODT standards are adopted by its subcontractors and consultants.

48.    However, Defendant routinely violates its own Code of Business Ethics and Code of Conduct.    During his employment, the Relator discovered that the Defendant routinely and

27

knowingly submitted millions of dollars of False Claims to the U.S. Government for the payment of costs that were fraudulent and/or not allowable, and have falsely certified its compliance with U.S. laws and regulations.

**B.    Federal Travel Regulations ("FTR"), Federal Acquisition Regulations ("FAR" and "DFAR") Travel Expense False Claims:**

    **1.)    Fraudulent Lodging "Expenses"/"Reimbursement"/Billings**

49.    In December of 2009, the Relator discovered EODT was routinely violating Federal Travel Regulations ("FTR") and Federal Acquisition Regulations ("FAR") with respect to its manner of "reimbursing" employees working in the field on various Task Orders being performed for the Department of the Army U.S. Army Corps of Engineers on contract 018, and it was, thereafter, submitting false claims to the Department of the Army U.S. Army Corps of Engineers seeking reimbursement of these costs when it knew the costs were not allowable, as the costs were not in compliance with FTR and FAR. In connection with the U.S. Army Corps of Engineers' Task Orders (and other U.S. contracts), Defendant was required to obey all the federal laws and regulations governing contractual relationships with the United States, including the provisions of Federal Travel Regulations ("FTR") 41 C.F.R. § 300-1.1, *et seq.* It is Relator's understanding that in submitting invoices to the U.S. Government for payment and as a condition of getting paid, EODT was periodically certifying compliance with the applicable federal laws and regulations, and as will be hereinafter discussed, EODT routinely, falsely certified its compliance.

50.    In December of 2009, the Relator received new duties when he was directed to start reviewing and approving expense reimbursement requests from field employees working in

Munitions Response and on the "Fort Benning" project that was re-mobilizing pursuant to a Task Order issued by the Department of the Army U.S. Army Corps of Engineers on contract No. 018, on or about December 2, 2009. Some of the field employees working on the Fort Benning project included:

1. Samuel W. Thomas;

2. Thomas N. Parker;

3. Craig A. DelRosenio;

4. Enrique D. Dabbs;

5. Stuart H. Blodgett; and

6. Brian N. Hood. It was Relator's understanding that these same field employees previously worked on other Task Orders for EODT.

51. When Relator was asked to approve expense requests for the above mentioned field employees, Relator discovered that the Defendant was paying the field employees working on this Task Order, the maximum per diem allowed for lodging while they were not incurring lodging expenses, and when they were not requiring receipts as required by the Federal Travel Regulations ("FTR"), 41 C.F.R. § 300-1.1, et seq., Federal Acquisition Regulations ("FAR") 48 C.F.R. 1.101, et seq. EODT was thereafter billing the "lodging expenses" directly to the Department of the Army U.S. Army Corps of Engineers, seeking reimbursement, even though the field employees were not staying in conventional hotels, were not incurring lodging expenses, and were not submitting receipts, but rather, they were staying in personally owned recreational vehicles or campers. Paying the employees the maximum per diem rate, under these circumstances, and then billing it to the U.S.

29

Government for reimbursement, was in direct violation of FTR and FAR, was a fraudulent practice, and constituted submitting False Claims.

52. After the Relator began objecting to this practice and as he tried to correct it, he discovered that EODT <u>had been routinely following this practice on the other Task Orders performed</u> <u>by EODT for the Department of the Army U.S. Army Corps of Engineers</u> (and other U.S. parties) going back for numerous years, resulting in gross over billings to the Federal Government, and numerous False Claims. After Plaintiff challenged this practice and attempted to change this practice, Defendant acknowledged it was wrong, but nevertheless failed to reimburse the Government, failed to disclose this to the Government, and continued the fraudulent practice. Defendant also began retaliating against the Relator, and ultimately fired him.

53. Given the nature of work performed by the Defendant on the various Task Orders for the U.S Army Corps of Engineers (and other U.S. parties), the Defendant employs numerous field employees who work on these projects throughout the United States. To date, it is Relator's understanding that Defendant has completed over seven hundred (700) Task Orders throughout the United States for the Department of the Army U.S. Army Corps of Engineers alone. The number of field employees working on the Task Orders at any given time varies depending on the number of Task Orders being performed, the scope of the projects, and seasonal weather constraints. The Relator would estimate that the number of EODT field employees in the U.S. on any given day would very between a low of eighty (80) to over two hundred and fifty (250). Pursuant to its various contracts with the U.S. Government (including Task Orders awarded on contract 018), the Defendant bills the Government for the hours and per diem charges of these field employees under the time and

30

materials provisions of the various contracts/Task Orders. With respect to their field employees, Defendant is required by regulation and by contract to comply with the Federal Travel Regulations, 41 CFR § 300-1.1, *et seq.*, and Federal Acquisition Regulations ("FAR"), 48 C.F.R. 31.205-46. It is Relator's further understanding that Defendant is required to certify its compliance with the Federal Regulations and its compliance with Federal Law, as a condition of receiving payment pursuant to its invoices to the U.S. Government, and Defendant has made these certifications knowing it was not in compliance with Federal law and regulations. 10 U.S.C. § 2324

54. As stated in the FTR:

> The FTR is the regulation contained in 41 Code of Federal Regulations (CFR), Chapters 300 through 304, which implements statutory requirements and Executive branch policies for travel by Federal civilian employees and others authorized to travel at Government expense.
> (41 CFR § 300-1.1.).

55. The FTR provides for reimbursement for the <u>cost</u> of certain types of lodging, up to the <u>maximum</u> per diem rate, which varies according to the temporary duty location. (41 CFR § 301-11.7). The FTR provides that employees may be reimbursed for the <u>cost</u> of lodging expenses based on a <u>maximum</u> lodging per diem rate that varies based on geography and other variables, and these per diem rates are set by the U.S. General Services Administration. For example, the domestic per diem rate for the fiscal year of 2009 for lodging at Fort Benning, in Columbus, Muscogee County, Georgia, was $92.00 per night.

56. FAR, 48 C.F.R. § 31.205-46, provides in part:

**31.205-46 Travel costs**

31

(a) Costs for transportation, lodging, meals, and incidental expenses.

(1) Costs incurred by contractor personnel on official company business are allowable, subject to the limitations contained in this subsection . . .

Costs for transportation may be based on mileage rates, actual costs incurred, or on a combination thereof, provided the method used results in a reasonable charge. Costs for lodging, meals, and incidental expenses may be based on per diem, actual expenses, or a combination thereof, provided the method used results in a reasonable charge.

(2) Except as provided in paragraph (a)(3) of this subsection, costs incurred for lodging, meals, and incidental expenses (as defined in the regulations cited in (a)(2)(i) through (iii) of this paragraph) shall be considered to be reasonable and allowable only to the extent that they do not exceed on a daily basis the maximum per diem rates in effect at the time of travel as set forth in the---

(i) Federal Travel Regulations, prescribed by the General Services Administration, for travel in the contiguous United States, available on a subscription basis from the-

Superintendent of Documents
U.S. Government Printing Office
Washington DC 20402

Stock No. 922-002-00000-2;

(ii) Joint Travel Regulation, Volume 2, DoD Civilian Personnel, Appendix A, prescribed by the Department of Defense, for travel in Alaska, Hawaii, and outlying areas of the united States, available on a subscription basis from the-

Superintendent of Documents
U.S. Government Printing Office
Washington DC 20402

Stock No. 908-010-00000-1; or

(iii) standardized Regulations (Government Civilians, Foreign Areas), Section 925, "Maximum Travel Per Diem Allowances for Foreign Areas," prescribed by the Department of

32

State for travel in areas not covered in (a)(2)(i) and (ii) of this paragraph, available on a subscription basis from the---

Superintendent of Documents
U.S. Government Printing Office
Washington DC 20402

Stock No. 744-008-00000-0.

. . .

    (6)   The maximum per diem rates referenced in paragraph (a)(2) of this subsection generally would not constitute a reasonable daily charge---
        (i)   When no lodging costs are incurred; and/or
        (ii)   On partial travel days (e.g., day of departure and return). Appropriate downward adjustments from the maximum per diem rates would normally be required under these circumstances. While these adjustments need not be calculated in accordance with the Federal Travel Regulation or Joint Travel Regulations, they must result in a reasonable charge. [Emphasis Added].

57.    EODT's practice of charging the U.S. Government the maximum per diem rate was clearly not reasonable, because the employees were not staying in conventional housing and were not incurring "lodging costs," as such, and receipts were not being submitted, yet EODT paid the employees the maximum per diem and then billed the U.S. Government for reimbursement knowing it had violated the FTR, its contracts, and while certifying its compliance with Federal law and regulations. Relator learned Defendant perpetrated this practice primarily because it:

a.)    Wanted to provide tax fee income to the field employees to lower depreciation for the R.V.'s/campers, and

b.)    Wanted to keep its labor rate low so it could win the bids.

33

58.     Pursuant to the FTR, <u>the type of lodging selected affects the amount of</u> reimbursement:

### 41 CFR §301-11.12  How does the type of lodging I select affect my reimbursement?

Your agency will reimburse you for different types of lodging as follows:

(a) *Conventional lodgings.* (Hotel/motel, boarding house, etc.) You will be reimbursed the single occupancy rate.

(b) *Government quarters.* You will be reimbursed, as a lodging expense, the fee or service charge you pay for use of the quarters.

(c) *Lodging with friend(s) or relative(s) (with or without charge).* You may be reimbursed for additional costs your host incurs in accommodating you only if you are able to substantiate the costs and your agency determines them to be reasonable. (You will not be reimbursed the cost of comparable conventional lodging in the area or <u>a flat "token"</u> amount).

(d) *No conventional lodging.* You may be reimbursed the cost of other types of lodging when there are no conventional lodging facilities in the area (e.g., in remote areas) or when conventional facilities are in short supply because of an influx of attendees at a special event (e.g., World's Fair or international sporting event). Such lodging includes college dormitories or similar facilities or rooms not offered commercially but made available to the public by area residents in their homes.

(e) <u>*Recreational vehicle (trailer/camper).*</u> <u>You may be reimbursed for expenses (parking fees, fees for connection, use, and disconnection of utilities, electricity, gas, water and sewage, bath or shower fees, and dumping fees) which may be considered as lodging cost.</u> (41 CFR §301-11.12). [Emphasis added].

59.     The type of expenses that are eligible for reimbursement when recreational vehicles are used (trailers/campers), are clearly set forth above in 41 CFR § 301-11.12(e), and would be more

34

in the range of Twenty Dollars ($20.00) per night, considering the employees are staying two (2) or more months, and often have multiple occupancy. Defendant's longstanding practice of charging the U.S. Government as if these field employees were staying in conventional lodging is unconscionable and fraudulent, yet EODT employed this practice on a routine basis for numerous years, and continues to employ this practice in order to retain the field employees who have grown accustomed to the extra tax free pay.

60.     Relator also discovered the field employees were not submitting receipts for lodging as mandated by FTR and FAR, yet were being paid the maximum per diem rates anyway, which in turn, were being fraudulently billed to the U.S. Army Corps of Engineers (and other U.S. parties). Clearly, the employees are required to provide receipts:

> **41 CFR. § 301-11.25  Must I provide receipts to substantiate my claimed travel expenses?**
>
> Yes.  <u>You must provide a lodging receipt</u> and a receipt for every authorized expense over $75, or provide a reason acceptable to your agency explaining why you are unable to furnish the necessary receipt(s) (see §301-52.4 of this chapter).
> **Note to 301-11.25:**  Hard copy receipts should be electronically scanned and submitted with your electronic travel claim when your agency has fully deployed ETS and notifies you that electronic scanning is available within your agency (see §301-50.3 of this chapter).  You may submit a hard copy receipt, in accordance with your agency's policies, to support a claimed travel expense only when electronic imaging is not available within your agency.

61.     After the Relator was asked to approve expenses on the Fort Benning Task Orders, he began holding up expense reimbursements, because lodging receipts were not being submitted by the field employees. Supervisory employees from the field began calling the Relator and started asking

35

him: "What was going on?" The Relator explained that he was not approving the expense reimbursement requests, because there were no lodging receipts, and their response would be that "we have always done business this way." Ten minutes later, the Vice President-Munitions Response, Matt Hulsey, then walked in the door and asked the Relator: "Why are you not paying the guys at Fort Benning?" Relator would then explain the problem. Finally, Relator was told that the field employees were not staying in hotels or motels, but they were staying in campers or R.V.'s, and that was why there were no receipts, and he was instructed to authorize the expenses. Griffith wanted no part in this ruse and he asked to be relieved of the duties.

62. The Relator learned that Defendant's part of the rationale for making the fraudulent lodging "reimbursement" is it is a way to provide tax free income to the employees in the field with the "justification" that the field employees who own the R.V.'s/campers can use this to cover the depreciation expense on their R.V.'s/campers. When the Relator confronted Steve Voland, Senior Vice President, about this fraudulent practice, Voland looked him in the eye and said, "because EODT cannot pay depreciation expenses on the field employees' assets, we are using the lodging dollars to supplement their income so the employees can afford to make their payments on their recreational vehicles." Clearly, the payment of depreciation is specifically not allowed:

**41 CFR § 301-10.304 What expenses are allowable in addition to the allowances prescribed in § 301-10.303?**
Following is a chart listing the reimbursable and non-reimbursable expenses:

| Reimbursable expenses in addition to mileage allowance | Non-reimbursable expenses included in the mileage allowance |
|---|---|
| Parking fees; ferry fees; bridge, | Charges for repairs, |

| | |
|---|---|
| road, and tunnel fees; and aircraft or airplane parking, landing, and tie-down fees. | *depreciation*, replacements, grease, oil, antifreeze, towage and similar speculative expenses, gasoline, insurance, state and Federal taxes. |

63.    In the middle of December at the EODT sponsored Knoxville arthritis kickoff fund raiser, Steve Voland, Senior Vice President, told the Relator that paying lodging in this fashion was the way EODT had always done business, and if they changed it, "nobody would work for them". Mr. Voland has been around since the late-1980's. Mr. Voland also said, "If we don't pay these damn people right now, they will walk off these jobs!"

64.    Voland did not hesitate to tell Relator that EODT can't stop paying the field employees the way they have been paying them for lodging, because there was no way for the employees to cover the depreciation expense on their motor homes that they have been buying, and that these things are expensive, however, man field employees don't own the R.V.'s/campers they stay in, but are "reimbursed" anyway. Voland told the Relator the R.V.'s cost Seventy Thousand Dollars ($70,000.00), and these people are buying them so they can take them to the job sites and live in them while they work. They also allow other EODT field employees to stay in them as well. Relator said that EODT could properly pay for some RV expenses pursuant to the FTR, however, EODT was paying employees as if they were staying in commercial lodging accommodations and at conventional rates when the employees were not incurring these conventional lodging costs. Steve Voland said, "This is the way we've always done it." He stated, "if we were to change it, all these people would walk off these jobs, and then we would be left out there with our pants down, embarrassed in front of the contractor, because we can't perform."

37

65.     Relator's investigation revealed this was standard practice on all of EODT's numerous U.S. Government contracts/Task Orders involving field employees going back numerous years. The field employees did not incur "lodging expenses" as such, but rather they incurred much smaller fees as described in 41 C.F.R. § 301-11.12(e), which would be more in the range of Twenty Dollars ($20.00) per night as compared to the Ninety-Two Dollars ($92.00) per night per diem "reimbursed" using the Columbus, Georgia example, or resulting in a daily overcharge of Seventy-Two ($72.00). The per diem lodging charges in other geographical areas are much higher, so the amount of the inflated, improper and fraudulent charges for field employees working at those locations would be much higher.

66.     After one episode of paying employees for lodging, Relator talked to Kathy Lindsey, Treasurer, and said he appreciated that she got the people paid, but it was not the right thing to do. She informed him that "We've been doing things this way forever." "This doesn't surprise me." "I know they all have their travel trailers." "I have been around for twenty years," and she told the Relator, "that's just the tip of the iceberg." The Relator believes that if she was put under oath she would answer direct questions and answer them truthfully, but would probably like to avoid that situation, because there is not one other person in the company, maybe outside of Steve Voland, Senior Vice President, who knows as much as she does regarding improprieties and illegal practices.

67.     The Defendant has a "company travel" policy: 022, dated August 20, 2009 "draft," approved by Matthew R. Kaye, President and CEO. This travel policy states in part:

2.0 POLICY

38

It is EODT's policy that employees performing business travel shall not be required to personally bear any unreasonable expense associated with travel, lodging, meals, incidentals, or other miscellaneous associated costs. Neither should EODT personnel expect "financial profit" from travel. EODT will comply with the FAR, FAR Supplements, and the appropriate travel regulations establishing a travel policy for "official business travel". For additional reference, please refer to the Federal Travel Regulations (FTR) official website at: http://www.gsa.gov/Portal/gsa/ep /channelView.do?pageTypeId=17113&channelPage=/ep/channel/gsaOv erview.jsp&channelId=24564

68.     EODT's Travel Policy, although out dated, is consistent with the Federal Travel Regulations, and this travel policy shows EODT had knowledge of the travel regulations and how to properly track and bill travel expenses, yet, EODT's long term practice of ignoring its own regulations in several different areas as alleged herein constitutes additional evidence of intent.

69.     Relator attended a "training seminar" on August 21, 2009 at Fox Den Country Club, in Knoxville Tennessee, when the Defendant's travel policies were discussed. Persons present at the training meeting included all senior company officials: Matthew Kaye, President and CEO, Steve Voland, Senior Vice President, the business unit Vice Presidents, Finance Managers and the CFO. All present would be hard pressed to deny knowledge of proper procedures. Yet the persons present know the travel policies are routinely ignored.

70.     Despite the clear language of its own policy that employees "will not profit from travel" and the statement that Defendant will comply with FTR and FAR, EODT's official, in practice, is to allow employees to profit from travel. EODT uses lodging "reimbursement" as a means of providing tax free income to the field employees, while boldly ignoring the clear

39

requirements of its own travel policies, not to mention clear FTR and FAR requirements. Clearly, Defendant's failure to follow its own policy is clearly relevant on the issue of intent.

71. **41 CFR § 301-11.304 What if my expenses are less than the authorized amount?** When authorized actual expense and your expenses are less than the locality per diem rate or the authorized amount, <u>reimbursement is limited to the expenses incurred</u>.

72. In one discussion with Matt Hulsey, the Vice President of Munitions Response, in or about February 8, 2010, he told the Relator, specifically, after speaking with Mr. Delrosio, who is probably one of the more senior people on the ground at Fort Benning, that Delrosio "knew how to play the game," which meant, as Relator later learned that he knew how to create false receipts. Later, as stated herein, the Relator began to receive fabricated receipts for lodging expenses from the field employees working at Fort Benning, in the following weeks. The fabricated receipts were created to appear as though employees were paying over Six Hundred Dollars ($600.00) per week to stay in local lodging. All of the employee receipts were in sequence, all signed by a person named "Liz," all paid in cash and received by an unnamed provider. After a continued heated debate, the Relator began receiving "receipts" created by employees to appear as if they were staying in furnished apartments that clearly appeared fraudulent.

73. Another motivation to pay fraudulent lodging expenses instead of increasing the income for the employees in the field is that it allows the company to keep their bid amounts lower because the contracts are competitively bid so EODT can win the contracts. Typically, EODT wins the contract with comparatively low wage rates and comparably low fully burdened labor billing rates. EODT then uses lodging dollars to supplement the field employees' income instead of raising

40

their wages, so EODT can effectively win the contracts. In the Department of the Army U.S. Army Corps of Engineers Task Order contracts, typically, there are two sets of approved rates: firm-fixed hourly rates, and time and material hourly rates for billing labor. EODT bills travel as another direct cost ("ODC").

74.     Typically, when EODT bids the Task Orders for the Corps of Engineers work under contract 018, EODT would bid whatever the published lodging per diem rate was for that locality, the maximum amount. For example, the Relator has specific information on Samuel Thomas on the Fort Benning Task Order. In his contract, it specifies he is to receive Ninety-One Dollars ($91.00) per diem for lodging payment. His total per diem is One Hundred Thirty Seven Dollars ($137.00). His wage rate is Twenty Six Dollars and Eleven Cents ($26.11) an hour, and Three Dollars and Thirty- Five Cents ($3.35) an hour for benefits. EODT bids the burdened rates included in the 0018 contract, which represents the wage rate * OH rate * GA rate * fringe rate. The employee would be guaranteed that he would receive the maximum per diem rate. The "Stateside Employee Services Agreement" provides in part: as far as lodging:

> **(b) Included in Per Diem.** (If applicable)
> If lodging is included in Per Diem then it is the 100% responsibility of the employee to secure said lodging and the employee is expected to do such in a manner so that the employee is ready to start work at the date and place as set forth above. At the discretion of EODT, Company site vehicles may be available to pick up employee on the way to the worksite, but only if on the way (otherwise the employee would have to drive to a designated "pick-up" point). If this option is not facilitated by EODT then it is the employee's responsibility to get to and from the worksite at their own expense.

The Agreement provides in part, as to "Per Diem":

41

### 5. PER DIEM

Per Diem is paid every two weeks. To set the amount of Per Diem paid, <u>EODT may use the JTR as guidance and what is set by the contracted agreement with EODT's Client</u>. Per Diem does not apply if you do not work on a scheduled workday. Per Diem is not paid for weekends if you do not work the scheduled workday either before or after said weekend. Per Diem does not apply if you are on leave of absence or are granted days off without pay. Per Diem does not apply when you are on home leave or other leave status. <u>The employee must submit the proper EODT paperwork to obtain Per Diem and/or confirm receipt</u>. At EODT's option, Per Diem may be paid in advance. EODT has the right, and the employee hereby authorizes EODT, to recoup any advance Per Diem that EODT might have paid but was not earned. [Emphasis Added].

75.     EODT has routinely ignored the requirement of providing a receipt. EODT bills the Government to recover the "lodging" per diem that was paid. From the surface, this appears legitimate. EODT bids it, EODT books it, EODT bills it, all the same way, and EODT pays the lodging amount to the employee the same way. On the surface, this looks legitimate, and this is how EODT has been getting away with this. Once this is investigated and it is determined that the field employees are actually staying in recreational vehicles and/or campers, and are <u>not</u> incurring lodging expenses remotely close to the billing amount, then it becomes willful fraud. On time and material project item numbers, EODT is bound by the FTR and FAR regulations. The practice of paying lodging at conventional rates while encouraging employees to occupy personally owned R.V.'s/campers to reduce the employee cost and then seeking full reimbursement from the U.S. Government, is fraud. The Federal Travel Regulations disallows this practice, and they also require a lodging receipt. EODT ignores the FTR requirement of a lodging receipt, or as Relator experienced, EODT project managers may suggest the employees create false receipts.

42

76.     Rick Lyons, Contract Manager, told Relator that Lisa Jacobson had told him to look into the circumstances of the Blackwater False Claims Act case, because the company was considering what might happen if the particular issue involving the false lodging invoices were to surface. Lyons, made it clear to Relator that in the Blackwater case, there was not enough to peak the threshold of interest for the Government, and that was the week before the Realtor was fired. Rick Lyons basically told the Relator that he did not think the issue with lodging was an issue that the Government would be interested in, and that nothing would happen. The Relator asked Mr. Lyons if the employee in Blackwater was at least protected under the whistleblower act, and he just chuckled and said he did not read anything about what happened to the employee, but obviously the employee is not there any longer. The Relator told him at this point that he had taken some preparatory measures and he was printing all email exchanges with Lisa Jacobson and putting them in a file. Lyons, then advised the Relator that he needed to take care of himself. Relator believes at that point he did not want to put himself in a personal situation where he would have been accountable for anything he might have said to the Relator.

77.     Rick Lyons has been in on Staff Meetings where the bogus lodging "reimbursement" issue has come up. It came up in a half a dozen Staff Meetings over the last couple of months of Relator's employment. Everyone in the meetings knew that there was a problem. The Relator was very transparent as he was trying to resolve the issue. Relator has a series of emails with various people when he is openly discussing this problem.

78.     The Relator and Rick Lyons probably talked about the lodging "reimbursement" issue three (3) or four (4) times and it was put on his plate to help resolve the problem, and Lisa Jacobson

43

first told Relator and Lyons to work together to solve the problem, then it was, "don't work together, don't worry about it, that Roger Rodhert was going to rewrite the policy, he is the Controller." But, to Relator's knowledge, Rodhert did not revise the policy, and he has done nothing to further prevent further fraudulent billings. Moreover, Defendant's policy was not the problem, it was Defendant's practice, and nothing was done to stop this practice and Relator was fired.

79.     On the day before he was fired, the day Relator received a warning letter. On the morning of the day he received the warning letter, he created and submitted a draft constructive travel cost worksheet to Matt Hulsey and Matt Hughes, detailing the proper practice for calculating and paying for RV expenses in lieu of conventional lodging for employees electing to use RV's.

80.     The Relator budgeted roughly forty-two (42) projects for the year 2010 in Munitions Response. For the Task Orders performed in the United States, the size of the projects could be anywhere from around One Million Dollars ($1,000,000.00) to Three Million Dollars ($3,000,000.00) to Four Million Dollars ($4,000,000.00), and the number of field employees vary, depending on the size of the projects and the weather anywhere from eighty (80) field employees to two hundred and fifty (250) field employees. In December of 2009, in the last report that the Relator saw, it indicated it was one of the slowest months and it indicated there were eighty (80) field employees in the field.     Relator believes this number of field employees working on Task Orders would be consistent for EODT over the past six (6) years. On information and belief, the vast majority of the EODT's field employees were staying in RV's, travel trailers, or campers, but were being improperly "reimbursed" for "lodging" without providing receipts at the maximum per diem rates as if they were staying in conventional hotels. Assuming the field employees were being paid a

44

lodging per diem at the maximum rate of Ninety-Two Dollars ($92.00) per night, (which actually could be much higher) when their actual allowable expenses were only Twenty Dollars ($20.00) per night, this would equate to a fraudulent excess "reimbursement" of Seventy-Two Dollars ($72.00) per night per field employee and this would equate to _daily_ fraudulent "reimbursements" of anywhere from Four Thousand Three Hundred Twenty Dollars ($4,320.00) (based on sixty (60) field employees) to Eighteen Thousand Dollars ($18,000.00) (based on two hundred fifty (250) domestic field employees in Munitions Response alone). Although, not all of these field employees stayed in travel trailers or campers, it is Relator's understanding that most did. Not all these employees owned travel trailers or campers either, but they stayed with an employee that did own one while performing the field work.

81.    Relator believes that the same travel irregularities and violations of FTR, FAR, and DFAR exist in the other two (2) units of EODT's business units, as well: Critical Missions Support Services and Security Services. Critical Missions Support had One Hundred Eight Million Dollars ($180,000,000.00) in revenues last year, and there is a lot more travel associated with Critical Missions Support Services than there is in Munitions Response. Critical Missions has numerous people in the field as does the Security Services division. Security Services, for example, has a Fifteen Million Dollars ($15,000,000.00) to Sixteen Million Dollars ($16,000,000.00) contact down in the southwest border. EODT is a subcontractor for that contract. The Relator does not specifically know whether or not the employees working on that subcontract are staying in travel trailers or hotels, or on other contracts with the Federal Government, but Defendant's use of "reimbursement" for lodging at maximum rates as a way to provide tax free income when employees

45

are actually staying in RV's or travel trailers, should be explored throughout EODT on all Government Task Orders/contracts, because based on Relator's experience, he believes this is a companywide problem, and a long standing and standard practice at EODT.

82.     In order to quantify and recover the actual amount of fraudulent payments received, the travel records will have to be audited and it is believed that the audit will reveal Defendant has routinely reimbursed, in violation of the FTR, at the maximum per diem rates, despite the fact that the actual lodging costs are much lower or non-existent. The daily figures mentioned above, could then be <u>annualized</u> to show potential false and fraudulent annual "reimbursements." The Realtor has prepared an estimate indicating potential fraudulent billings of Six Million, Seven Hundred Seventy Thousand, Seven Hundred Fifty Dollars ($6,770,750.00) per year. Over a six (6) year period, this would equate to potential false and fraudulent "reimbursements" of approximately Forty Million, Six Hundred Twenty-Four Thousand, Five Hundred Dollars ($40,624,500.00). All of the false and fraudulent "reimbursements," with full knowledge, were being improperly invoiced to, and paid by, the U.S. Government.

**2.)     Fraudulent Travel Expenses/Reimbursement/Billings**

83.     Shortly before the Relator's termination, he discovered that the Defendant was also fraudulently inflating travel reimbursements to the field employees by overpaying them for their travel to field locations. Terry Voland, co-manages EODT's travel. She is the wife of the Senior Vice President, Steve Voland. Relator discovered that she was improperly computing the amount EODT reimburses for travel to field locations. She was using the cost of a single leg airfare, multiplied by two (2), as opposed to using the cost of a round trip airfare, as specified by the FTR.

46

41 CFR § 301-70.525(b). EODT would thereafter invoice the U.S. Government for the inflated reimbursement. The FTR provides, in part:

### § 301-10.305 What are the presumptions as to the most advantageous method of transportation?

(a) *Common carrier.* <u>Travel by common carrier is presumed to be the most advantageous method of transportation and must be used when reasonably available.</u> [Emphasis Added].

### § 301-10.305 How is reimbursement handled if another person(s) travels in a POV with me?

If another employee(s) travels with you on the same trip in the same POV, mileage is payable to only one of you. No deduction will be made from your mileage allowance if other passengers contribute to defraying your expenses.

### § 301-10.309 What will I be reimbursed if I am authorized to use common carrier transportation and I use a POV instead?

<u>You will be reimbursed on a mileage basis</u> (see § 301-10.303), <u>plus per diem, not to exceed the total constructive cost of the authorized method of common carrier transportation plus per diem.</u> Your agency must determine the constructive cost of transportation and per diem by common carrier under the rules in § 301-10.310. [Emphasis Added].

### § 301-70.505 How do we define actual cost and constructive cost?

(a) Actual cost of travel will be the transportation expenses incurred and en route per diem for the travel as actually performed from the point of interruption to the alternate location and from the alternate location to the TDY assignment. No per diem is allowed for time spent at the alternate location confined to a medical facility.

(b) <u>Constructive cost is the sum of transportation expenses the employee would reasonably have incurred for round trip travel between the official station and the alternate location</u> plus per diem calculated for the appropriate en route travel time. [Emphasis Added].

### § 301-70.105 May we prohibit an employee from using a POV on official travel?

47

No, but if the employee elects to use a POV instead of an alternative
form of transportation you authorize, you must:
   (a) Limit reimbursement to the constructive cost of the
   authorized method of transportation, which is the sum of per diem
   and transportation expenses the employee would reasonably have
   incurred when traveling by the authorized method of
   transportation; and
   (b) Charge leave for any duty hours that are missed as a
   result of travel by POV. [Emphasis Added].

84.   Relator discovered that Terry Voland would get a cost "comparison" for a one way

ticket. For example, from Knoxville, Tennessee to Las Vegas, Nevada, the cost of a one way ticket

on United is Eight Hundred Forty-Four Dollars ($844.00), and the cost of a round trip ticket is One

Thousand Sixty-Six Dollars ($1,066.00). If an employee drove his recreational vehicle from

Knoxville, Tennessee to Las Vegas, he would be reimbursed Eight Hundred Forty-Four Dollars

($844.00) (the one way fare), instead of Five Hundred Thirty-Three Dollars ($533.00) (one half the

round trip fare), and he would be reimbursed Eight Hundred Forty-Four Dollars ($844.00) for the

return leg, instead of Five Hundred Thirty-Three Dollars ($533.00). This would result in an

overpayment for this trip for this one employee of Six Hundred Twenty-Two Dollars ($622.00)

using this example. This inflated amount would, thereafter, be billed to the U.S. Government and

paid by the U.S. Government, instead of the round trip comparison as required by the FTR.

85.   The day before Relator was fired he prepared a Constructive Cost Worksheet showing

proper ways to reimburse for lodging and for travel, and submitted it to Matt Hulsey.

86.   From on or about February 2, 2010 to February 12, 2010, the Relator had several

discussions where he pointed out that this reimbursement practice was a violation of FAR and FTR

with Rick Lyon, Matt Hulsey, Dave Mayfield, Mike Pate, Stuart Blodget, Brian Andrea, Matt

48

Hughes, Rodger Rohdert, Russ Katzman, Lisa Jacobson, and Steve Voland and it was acknowledged this was an improper practice. On or about February 17, 2010, he put together a Constructive Cost Worksheet to demonstrate the proper method of computing the proper "reimbursement" by using the cost of a round trip ticket. Relator also had discussions with Bill Brown, a Project Manager, in regard to this issue. The constructive cost worksheet that the Relator prepared is in the possession of the Defendant, but the Relator reconstructed from memory the Constructive Cost Worksheet. The Relator prepared the Constructive Cost Worksheet, and provided it to Matt Hulsey, Vice President-Munitions Response and Matt Hughes, Acting Vice President-Munitions Response, the day before he was fired.

87.    During his discussions with various EODT employees about this fraudulent practice, including Rick Lyon, Matt Hulsey, Mike Pate, Stuart Blodget, Rodger Rohdert, Russ Katzman, and Lisa Jacobson, Relator learned that this had been EODT's standard way of reimbursing for employee travel. The Relator would, therefore, suggest that all travel reimbursement for EODT employees should be audited.

88.    In the Munitions Response Unit alone, Defendant has completed over seven hundred (700) Task Orders, using at any given time, eighty (80) to two hundred fifty (250) field employees. It is Relator's understanding this same "reimbursement" practice was utilized for all travel, for all of Defendant's employees in all three business units of EODT. However, limiting this to the Munitions Response field employees, assuming just seven hundred (700) Task Orders of just one hundred (100) field employees working and traveling to and from each, and with excessive payments of only Three Hundred Dollars ($300.00), this would equate to fraudulent overpayments of conservatively Four

49

Hundred Twenty Six Thousand Dollars ($426,000.00) on an annual basis (and Two Million, Five Hundred Fifty Eight Thousand, Four Hundred Dollars ($2,558,400.00) over six years), but if this was audited throughout all three business units the actual amount would be much higher.

### 3.) General and Administrative Charges Assessed to Fraudulent Traveling Expenses/Billings

89.   EODT's standard accounting practice is to bill general and administrative expenses on top of travel and lodging, so when it bills, EODT uses whatever its year-to-date general administrative percentages are (EODT pool account divided by the EODT base accounts), and in 2009, it was approximately thirty percent (30%).  Typically, G&A expenses have run about thirty percent (30%).  EODT tacks general and administrative charges on top of the fraudulent lodging and travel invoices to cover administrative expenses.  However, not every Department of the Army U.S. Army Corps of Engineers job allows general and administrative expenses to be billed on top of lodging costs, so the individual contracts would need to be examined in that regard.  If the contracts allow general and administrative costs to be billed on top of travel·and lodging, and a multiple of thirty percent (30%) is applied, the amount of revenue resulting from the fraudulent charges increases significantly.  For example, applying this to the previous estimates of daily false charges for lodging and travel would indicate additional assessments on top of the bogus lodging and travel expenses of approximately Two Million, One Hundred Three Thousand, Seven Dollars ($2,103,007.00) per year and Twelve Million, Six Hundred Eighteen Thousand, Forty Two Dollars ($12,618,042.00) over the past 6 years.  Relator does not believe that every Department of the Army United States Corps of Engineers Task Order, contract 018, allows EODT to bill G&A on top of

50

lodging, but he believes some allow this. This allegation will need to be verified by reviewing the actual contracts. However, most of the time Government contracts allow for G&A to be billed on top of lodging and travel, Relator would recommend that all of EODT's contracts for all three business units be examined.

## C. Excessive and Arbitrary Material and Handling Charges Billed in Violation of FAR/DFAR

90.     During his employment, Relator discovered that EODT routinely bid and billed the U. S. Government an arbitrary material handling rate of seven point five percent (7.5%) on time and material contracts, even though the actual material handling rate was much lower. On or about September 7, 2009, the Relator's Project Control Specialist, Lindsey Cox, brought him a project proposal that she was working on, and it had the seven and one half percent (7 ½%) material handling charge. Relator asked her: "Why are you doing this?" She responded by saying "because we have always done it this way." "There has never been any difference." "It has always been seven and one half percent (7 ½%)." However, EODT's actual material handling rate had been averaging around two and a half percent (2 ½%) to three percent (3%). This was the actual burden rate. Relator discovered that assessing this arbitrary seven and one half percent (7 ½%) rate was a standard practice going back years. Assessing an arbitrary material handling rate constitutes a FAR violation,    since time and material contracts do not include provisional billing rates.

91.     48 C.F.R. 16.601, provides, in part:

### Time-and-materials contracts
. . .

51

(3)    *Material handling costs.* When included as part of material costs, material handling costs shall include only costs clearly excluded from the labor-hour rate. <u>Material handling costs may include all appropriate indirect costs allocated to direct materials in accordance with the contractor's usual accounting procedures consistent in Part 31</u>. [Emphasis Added].

. . .

48 C.F.R. 31.203, provides, in part:
(i)    Indirect costs that meet the definition of "excessive pass-through charge" in 52.215-23 are unallowable.

48 C.F.R. 52.215-23, provides, in part:

Limitations on Pass-Through Charges.
(a) *Definitions.* As used in this clause---

. . .

*Excessive pass-through charge*, with respect to a Contractor or subcontractor that adds no or negligible value to a contract or subcontract, means a charge to the Government by the contractor or subcontractor that is for indirect costs or profit/fee on work performed by a subcontractor (other than charges for the costs of managing subcontracts and any applicable indirect costs and associated profit/fee based on such costs).

*No or negligible value* means the Contractor or subcontractor cannot demonstrate to the Contracting Officer that its effort added value to the contract or subcontract in accomplishing the work performed under the contract (including task or delivery others).

92.    Under the Department of the Army U.S. Corps of Engineers Task Orders on 018, as far as Relator could ascertain, it was pretty much standard to have the seven point five percent (7.5%) material and handling rate on all proposals in Munitions Response. The Relator questioned this and wondered why EODT would be billing at seven point five percent (7.5%) when the actual rate was substantially lower. When the Relator started looking at the Financial Statements, he started to see that the actual material/handling rate was, two and one half percent (2 ½ %) to three percent

52

(3%). The Relator said to Matt Hulsey, Vice President-Munitions Response "why are we billing at seven point five percent (7.5%) on a time and material contract?" Matt Hulsey responded: "This is the way we've always done it." The arbitrary material handling bid would be buried in the bid and not readily apparent on the bills so it is no wonder the Department of the Army U.S. Army Corps of Engineers has not caught this. During some of the weekly Finance Department Staff Meetings that Relator attended in January and February, 2010, it was discussed that this practice was wrong, but it was apparent to Relator that the practice would continue, because it has proven too lucrative to EODT, even though it is clearly fraudulent. Rick Lyons discussed this openly with Relator in staff CFO weekly meetings, prior to Relator's termination.

93.     It is Relator's understanding that someone at EODT started using the seven point five percent (7.5%) charge a long time ago and EODT continued to bid at that rate, and/or assess charges at that rate on subsequent Government contracts, even though this is in violation of FAR. Relator learned that assessing the seven point five percent (7.5%) handling rate had been the standard practice of EODT. The Relator learned prior to his discharge that the United States Forces contracts and Task Orders that were being billed in January and February of 2010, were also being bid and going to be billed at this inappropriate and fraudulent rate.

94.     Relator discovered this practice was being assessed on the bids for Task Orders pursuant to Department of the Army U.S. Army Corps of Engineers contract number W912DY-04-D-0018 ("the 018 contract") EODT has been performing Task Orders under this contracts for five years, and prior to the five year period, was performing Task Orders on other munitions clearance projects for the United States Army Corps of Engineers assessing this same material handling rate of

53

seven and one half percent (7 1/2%) to the best of the Relator's information, knowledge and belief. This charge far exceeded the actual material handling rate which is more in the range of two and one half percent (2 1/2%) to three (3%) percent. The excessive material handling charge, the way its set up, is a direct result of negotiations that took place when the contract 018 was negotiated and awarded over five (5) years ago, and every single Task Orders since that time has had a separate material handling charge billed in against that contract. The United States Army Corps of Engineers negotiated with EODT five years ago and EODT changed their accounting practices with the contract in Huntsville. The reason why the material handling charges in Munitions Response is handled in this manner is because, EODT negotiated that a separate material handling rate would be assessed, but this is supposed to be the actual material handling rate, not an artificial inflated bid rate. All the other business units, Security Services and CMS, have material handling expenses but they are included in the general administrative expenses. Munitions Response is the only business unit with a separate material handling charge.

95. The fraudulent over charge of the material and handling rates is very significant because a large amount of the expenses incurred by EODT involve substantial material costs. The charges are assessed on the subcontractors invoices, and the materials used to support government contracts, everything outside of direct labor, all indirect charges, including rental equipment, travel, lodging, etc. The excessive material handing charge is added on top of these expenses to fraudulently inflate the over all cost to the Government by approximately four point five percent (4.5%) to five percent (5%) in excess of what it should be. EODT corporate retains the overage in its cost/profit center on their financial statements.

54

96.     The actual material handling rate is in the monthly closing documents in EODT's financial statements. On the end of the month closing reports, under tab "Statement of Indirects," it shows exactly what the material handling charges are Munitions Response Unit for that period. In order to verify this allegation, the Statement of Indirects for the last six (6) years should be obtained and reviewed so the actual rate can be compared with the seven and a half percent (7 1/2 %) rate that was billed.

97.     In or about January 2010, DCAA was in Lenoir City conducting a pre-award audit. EODT bid as a subcontractor on a Kuwait ammunitions supply contract. The bid was sealed and it was sent to SAIC as a sub-contract proposal and not a solicitation under the USACE 00018 Contract, and they submitted it to the Government. The Government, DCAA, selected EODT for a pre-award audit. Not surprisingly, DCAA determined that EODT had violated FAR because in the bid proposal they were proposing an arbitrary seven point five percent (7.5%) material handling rate when they should have been proposing the actual material handling rate of two and a half percent (2 ½%) to three percent (3%), and that was an audit finding by DCAA in January of 2010. Shortly before the Relator's termination, he met with Rick Lyons, Director of Contracts, on a debriefing, on the audit done by DCAA on the SAIC prime bid. The DCAA auditor had told Rick Lyons in the out briefing that the seven point five percent (7.5%) material handling charge that was bid by EODT was not substantiated, and the reason it was not substantiated is because there was nothing to validate the rate.

98.     The arbitrary seven point five percent (7.5%) material handling charge has been routinely assessed on other governmental contracts and Task Orders. For example, there is another

55

Task Order on the 018 contract, and it is a Task Order called "MD," and it is a project in Iraq that has been going on now for a couple of years, and it is now worth probably Nine Million Dollars ($9,000,000.00) a year. The Relator believes the arbitrary material handling charge would have also been illegally charged on that contract, as well.

99.     Under the 018 Contract, the Task Orders on that over the past five (5) years were in excess of One Billion Dollars ($1,000,000,000.00), exclusive of the one that EODT was recently awarded in Afghanistan. The current Department of the Army United States Forces Task Orders for the U.S. Army Corps of Engineers 018 contract, the international portion in Afghanistan, is an Eleven Point Seven Million Dollar ($11,700,000.00) Task Order, funded today at that amount, but is projected to be approximately One Hundred Twenty Million Dollars ($120,000,000.00) over the next five (5) years. Relator estimates that the indirect expenses subject to the fraudulent material and handling charge on the Eleven Point Seven Million Dollar ($11,700,000.00) of the Task Order portion, would be approximately Three Point Five Million Dollars ($3,500,000.00) (or twenty-nine point ninety-nine percent (29.99%) of Eleven Point Seven Million Dollar ($11,700,000.00)). EODT is assessing a seven point five percent (7.5%) material handling charge on the indirect expenses, when the actual material handling cost is more in the range of two point five percent (2.5%) to three percent (3%). This means EODT is violating FAR by assessing a fraudulent excessive rate of between five percent (5%) and four point five percent (4.5%). This would equate to excessive material handling charges of between One Hundred Fifty-Seven Thousand ($157,000.00) to One Hundred Seventy-Five Thousand ($175,000.00) on this Eleven Point Seven Million Dollar ($11,700,000.00)Task Order alone. This Task Order could be extended to One Hundred Point Two

56

Million Dollars ($120,000,000.00), which using the same percentages, would indicate indirect costs of approximately Thirty Five Million Nine Hundred Eighty-Eight Thousand Dollars ($35,988,000.00), and excessive material handling charges of between One Million Six Hundred Nineteen Thousand Four Hundred Sixty-Six Dollars ($1,619,460.00) to One Million Seven Hundred Ninety-Nine Thousand Four Hundred Dollars ($1,799,400.00).

100.    Relator has estimated the arbitrary, improper, and illegal material handling charges to the Department of the Army U.S. Army Corps of Engineers has resulted in overcharges of approximately Five Hundred Fifty Two Thousand Dollars ($552,000.00) per year or Three Million, Three Hundred Twelve Thousand Dollars ($3,312,000.00) over the past six years, but the actual amount could be much higher.

**D.    Potential Bribes/Inappropriate Billings to U.S. Government/False Certifications**

**1.)    Mysterious/Questionable Payments Made To Get Access To Royalty In Saudi Arabia**

101.    The Relator became aware of a Twelve Thousand Five Hundred ($12,500.00) per month payment on or about January 9 of 2010 involving a joint venture proposal that Defendant had with a company called, something like, Dynacorp. Relator was told by Matt Hughes that the Twelve Thousand Five Hundred Dollars ($12,500.00) a month payment was being made to get access to royalty in Saudi Arabia so the bid on an Eighty Million Dollar ($80,000,000) project in Saudi Arabia would be awarded to EODT.

102.    While working on the 2010 budget, he saw the 2009 expense of approximately Three Hundred Thousand Dollars ($300,000.00) for outside consultants in the general ledger, but Relator

57

could find no invoices to substantiate the charges. Speaking with Matt Hughes, the Program Manager, in or about October of 2009, the Relator questioned exactly what the outside consultant was doing for the company, and Matt Hughes replied nothing, "he provides us access." Matt Hughes stated that EODT was paying for "marketing services," but Relator never saw an invoice for "marketing services." The payments were being handled by Steve Voland, Senior Vice President, and the Realtor would see an expense in the general ledger charged against Munitions Response with the Relator's project numbers. In questioning Matt Hughes about these payments, the Relator questioned how he needed to accrue money for the expenses when he really did not know when it was going to happen. Mr. Hughes responded: "they did not know when it was going to happen either." Mr. Voland stated, "there was a guy who simply called them and said, 'if you want to stay in the game, you are going to make the payment,' and we make the payment.'" Typically, the payment is Twelve Thousand Five Hundred Dollars ($12,500.00). The Relator does not know where this person is located, but it is his understanding, EODT pays this individual in order to gain access to the royalty in Saudi Arabia.

103.    In the Fall, EODT stopped making the Twelve Thousand Five Hundred Dollar ($12,500.00) payments, and Matt Hughes told the Relator that Steve Voland and the senior leadership team of the company had decided that pursuing Saudi Arabia was becoming a financial risk to the company to continue to pay for marketing services when the contract had not been awarded yet as it was supposed to have been in 2009. This was the Relator's last real discussion about this issue until he saw another Twelve Thousand Five Hundred ($12,500.00) payment hit his general ledger account in the January 2010 closing. The Relator questioned Matt Hughes in a 2010

58

operating budget meeting about this charge and stated that he thought the company was done with this "outside consulting." The Relator stated that he had not been budgeting for this outside consulting. The contract that EODT was trying to obtain involved property in Saudi Arabia where tons of munitions had been dropped on hundreds of acres, and it was the Relator's understanding that the business was going to be run through some type of a joint venture. It was the Relator's understanding that EODT was paying these "marketing/consulting expenses," but were never charging or reclassifying the expenses of the marking/consulting to this other legal entity. EODT was absorbing all the costs in Munitions Response.

104. Whenever there was a discussion of these payments, there was a level of uneasiness and secrecy surrounding this particular practice where high level employees like Matt Hughes remained very illusive and very uncomfortable in every discussion involving the payments. Each time Relator asked a question, Matt Hughes was extremely uncomfortable with Relator's probing. Matt Hughes and Relator had a follow up discussion as recently as February 15, 2010 concerning this matter. Relator was fired on February 17, 2010.

105. Matt Hughes, Range Xchange Program Manager, is one (1) step down informally on the organization from the senior management team. He has worked with Steve Voland, Senior Vice President, for approximately twenty-five (25) years. They know each other well from the Army. He is the most senior program manager in munitions response. He runs the Range Xchange Program which is the recycled targets and range clearing, and he would be the primary business point of entry for the Saudi Arabia clearance project, since he worked on a security detail with the Royal Family

59

during the Army.  Matt Hughes runs all the range clearances for EODT, all across the United States and across the globe.

### 2).    Potential Bribe Paid to Settle "Tax Liability"/Obtain License in Afghanistan

106.    The Relator sat in on a meeting with Kevin Beamish, Finance Director in CMS, in or about December 2009, and at that time, he learned through Mr. Beamish that the business license that Munitions Response needed to perform work in Afghanistan was being held up by Afghanistan, because of some "tax liability issues."  The tax issues were tax liabilities due the Afghanistan Government in connection with the people working there.  As Relator understood, the amount of "tax liabilities" were approximately Four Hundred Sixty Thousand Dollars ($460,000.00).  The license issue was potentially huge, because Defendant had contracts or had been awarded contracts, and/or had bid contracts to perform work in Afghanistan in the multi, multi-million dollar range, and it had to have the license as a requirement to bid on the final USACE 00018 Task Orders.

107.    In or about December, 2009, Kevin Beamish went to Afghanistan to represent EODT and their interests to try to resolve this issue.  There was a follow-up financial review meeting roughly three (3) or four (4) weeks later, and at that time, a direct charge of Two Hundred Thousand Dollars ($200,000.00) showed up as a charge against Relator's project in Afghanistan, project 3181, in miscellaneous direct expenses.  The Relator had not budgeted for this expense, and the Finance Director, Emmanuelle Obasiolu, did not know about this expense.  Relator understood, however, that Beamish apparently had negotiated some kind of "settlement" with a member of the Afghanistan Government in the Department of Defense, and Defendant got its license renewed.

60

108. After the Two Hundred Thousand Dollar ($200,000.00) charge appeared against Relator's project, he went to get an explanation, and he had an email and phone call at a staff meeting with Emmanuelle Obasiolu, who is the Finance Director on the ground in Afghanistan. It was explained to Relator by Emmanuelle Obasiolu, that Beamish had gone to the Afghanistan Defense Ministry and paid a Two Hundred Thousand Dollar ($200,000.00) "facilitation charge." The Relator never saw any documentation, and he never saw an invoice for this charge. The Two Hundred Thousand Dollars ($200,000.00) came out of <u>cash</u> in Afghanistan, out of EODT's safe. The Relator submits that there should be an invoice somewhere for this payment, and there should have been a cash log that came back from Emmanuelle Obasiolu, back to the host office in Lenior City, and someone in the Accounting Department who worked for Roger Rohtert, Controller, should have reviewed the cash log. The normal process would be the Two Hundred Thousand Dollar ($200,000.00) expense came out of the cash log that was in an excel worksheet and then the expense would be transferred to the Project's Expense Account.

109. The Relator went to a financial management review on February 17, 2010, from 1:00 to 4:00 p.m., and this charge was discussed. The Relator, the President of the Company, the CFO of the company, the Controller, Kevin Beamish, and others were present at this review. They wanted to discuss Relator's Afghanistan project and wanted to know why it had a reduced level of profit. The Relator stated that there was a Two Hundred Thousand Dollar ($200,000.00) miscellaneous direct project expense charge that had been assessed, and he had not been able to determine what that charge was for, at this point, but "maybe Kevin Beamish could help explain it." Lisa Jacobson, the CFO, immediately interjected: "that it was not a direct project expense that was taken out of your

61

direct project expense and put into overhead." The Relator never got the explanation and was not able to validate this statement, because he was fired the next morning.

110.    EODT was involved in different projects in Afghanistan at a time and the Relator could not understand how he would get a Two Hundred Thousand Dollar ($200,000.00) charge assessed directly to his project and EODT would not be able to validate the purpose of the charge. This was very suspicious to Relator. The Relator cannot state that this was a bribe, but in his opinion, it did not appear to be a legitimate business expense. He believes it was an improper payment made in haste to try to settle an issue and get the license renewed, and the cash payment may have likely been made to a person, not necessarily the Afghanistan Government.

111.    A license was mandatory for the Munitions Response unit because that was a one hundred percent (100%) pre-qualification requirement when the Task Order for the United States Forces was bid. EODT won the Task Order on December 29, 2009. The ceiling of that task force order now is forty million dollars ($40,000,000.00), but it could be extended year by year. The Relator does not know if the license issue was renewed before or after the bid was made, but that should be examined, as well as the true nature of the Two Hundred Thousand Dollar ($200,000.00) payment. The timing of the expense would tend to indicate there was not a license at the time the project was bid, because the Task Order was awarded on December 29, 2009, and the "charge" was posted in January 2010. The payment could also, clearly, be an improper payment or a bribe.

112.    Emmanuelle Obasiolu is the Finance Director in Afghanistan, responsible for cash disbursements. Relator began including him on emails concerning 3181 Logar/U.S Forces. On or about January 15, 2010. However, he was instructed by Brian Andrea, Program Manager for all of

62

Afghanistan, not to include him anymore on the emails in or about late January 2010, because "he didn't need to know everything happening in Afghanistan." Relator thought that it was awkward that EODT suddenly did not want to include Obasiolu in email correspondence. Obasiolu had found an empty book of receipts in the truck, and this had indicated bogus receipts and bogus "reimbursements" were being made, and then reimbursed by the U.S. Government. Obasiolu took over from the previous Project Director in Afghanistan, disburses the cash, and keeps the cash logs and sends them back to the company in Lenoir City. Relator believes he is instrumental to any investigation. He has been "in-country" and has been finding a lot of things inappropriate and probably improper, and in some cases, highly illegal. As far as the Two Hundred Thousand Dollar ($200,000.00) cash disbursement, the Relator does not know if Obasiolu would have specific knowledge of that, but Obasioulu did report directly to Kevin Beamish, he worked together with Beamish when he was there. The exchanges that the Relator received from Emmanuelle Obasiolu were more administrative in nature. The exchanges Obasiolu had with Kevin Beamish did not include the Relator.

113. Obasiolu charged Two Hundred Thousand Dollars ($200,000.00) against the Relator's job, because he is the Finance Director "in-country," but he did not have any dialog with the Relator, specifically, on that issue either orally or in writing. Kevin Beamish flew to Afghanistan, resolved the problem with cash that came out of Emmanuelle Obasiolu safe, and Emmanuelle Obasiolu booked the expense into the Relator's job. If there were similar bookings on other jobs, the Relator does not know. This process has left the Relator with a lot of questions. The Relator would speculate that Emmanuelle Obasiolu gave cash in the amount of Two Hundred

63

Thousand Dollars ($200,000.00), but did not attend any meeting with Kevin Beamish in which that was transmitted. Kevin Beamish would have then brought back some type of "documentation" to log the expense, because it was booked against the Relator's project.

114.    As far as how the Two Hundred Thousand Dollar ($200,000.00) cash payment would have been booked by EODT and recouped from the Government, it was initially put in as a direct project expense on the Relator's project, which would then be billed directly with the project expenses. During the staff meeting Kevin Beamish told the Relator that the day before he was fired that the Two Hundred Thousand Dollar ($200,000.00) expense was no longer on his project as a direct expense, that it had been reclassified as an overhead expense. If the Two Hundred Thousand Dollars ($200,000.00) is left in overhead, then it becomes part of the overhead rate, and EODT will eventually recover that from the Government. The matter was discussed at the senior staff meeting with the President of the company charged with presenting the performance of the job. Kevin Beamish, the Finance Director from CMS (another business unit), told the Relator that it was not a direct project expense, that it was not there anymore. It had been moved to overhead, and to the Relator, that was highly unusual since the Critical Mission Systems Finance Manager was booking expenses in Munitions Response with no approval from the Munitions Response Finance Manager (the Relator) and without any coordination.

115.    The issue to the Relator is, was it a license expense or was it a payoff? If it was a license expense it should have been put in as a direct project expense, and not into overhead. The project they were working on, the job was called Logar. EODT had to have an Afghan license to do business to do the Logar job.

64

### 3.)     Other Financial Issues/Discrepancies/Improper Charges/Billings

#### a.)     Missing Funds.

116.     On several occasions, Kathy Lindsey, the Treasurer, told Relator about millions of dollars that were missing from the safes in Iraq, in 2004 and 2005, and it was never explainable. She also discussed with him on several occasions that the financial improprieties he was trying to fix were just the "tip of the iceberg." Relator does not know how, or if, EODT invoiced the U.S. Government for these missing funds or what the funds were used for, but he verily believes they were recovered from the U.S., so he would recommend a thorough audit of all contracts EODT has performed for the U.S. Government.

#### b.)     Working at Risk and Billing the U.S. Improperly.

117.     Approximately in or about the second week of January of 2010, the Relator learned that in connection with the Critical Missions Support Services section of EODT that approximately three hundred (300) security guards had been mobilized in Iraq by the company and sent into the country with no notice to proceed by the Government pursuant to a DOD Army Contract. Thereafter, EODT improperly billed the subsistence of the people to the Government before the notice to proceed was actually issued which resulted in approximately, Three Hundred Thousand Dollars ($300,000.00) to Four Hundred Thousand Dollars ($400,000.00) in subsistence charges which were subsequently billed to the Government and were paid by the Government. Since there was no authorization to proceed, and the Defendant knew the charge was improper as hereinafter alleged, this would constitute a False Claim. However, apparently one of the contract specialists

from the Army discovered this "oversight" and they took it to the contracting officer, and then they began negotiating with EODT on the issue.

118.    The Relator attended a staff meeting, and in that staff meeting with Kevin Beamish, Finance Director of Critical Mission Support, present, it was discussed that a Four Hundred Thousand Dollars ($400,000.00) reserve was set aside for the resolution of this "issue." Rick Lyons, the Contracting Officer, was assigned to try to resolve this issue with the Army and to try to limit the financial liability of EODT with the Army.

119.    During this staff meeting, Lisa Jacobson, the CFO, asked Kevin Beamish if the company was "at risk on this project," and he replied "yes, they are at risk." He stated that EODT had proceeded without a notice to proceed authorization, and if they had not, the required service people would not have been in Iraq at the time of the notice to proceed. She also asked him if they (his business unit and staff) were "wrong in doing that," and he replied, "absolutely."

120.    The term "working at risk" is a common term used by EODT which is also described as "leaning forward in the fox hole," and is part of the basketball "fast break" metaphor mentality. "Working at risk" activities must be specifically approved by Steve Voland, Senior Vice President.

    c.)    **Violation of 41 U.S.C. § 923(b) and "Show Cause Letter" of Potential Debarment.**

121.    The Defendant was sent a "show cause letter" on September 14, 2007 advising it that the Department of the Army was considering it for debarment from future contracting with agencies for the Executive Branch of the United States Government. The allegation was that Eric W. Barton, while Deputy Country Manager in Iraq for EOD Technology, Inc. from on or about December 1,

66

2005 and March 31, 2006, received procurement sensitive information regarding the prospective awards of a contract in violation of 41 U.S.C. § 923(b). This was in regard to contract number W91640-06-A-0003. EODT also filed a suit against Barton and others that was thereafter dismissed. The debarment issue is also discussed in the lawsuit mentioned in subsection No. 4 below. The improprieties raised during the debarment proceedings, and certifications made when Defendant's agents and employees had knowledge of the improprieties, could constitute the basis for numerous False Claims made thereafter.

d.) **Allegations raised in *Patton v. EOD Technology, Inc.* (Those concern potential violations of Federal Laws and Regulations, which corroborate improper payments, over charging, false certification issues previously mentioned by Relator).**

122. In *Donald M. Patton v. EOD Technology, Inc.*, Chancery Court, Loudon County, Tennessee, Docket No. 11622, there are several improprieties alleged that touch on some of the allegations previously discussed, and if true, which raise some additional issues. The Complaint states that Clay Turner, EODT's Corporate Risk Manager had an improper affair in or around August through November, 2006, with an Air Force Contracting Officer for the United States Government, while Caldwell was assigned to oversee EODT's contracts with the Government for FOB Shield, and while he was EODT's Senior Manager in Iraq. The suit alleges, thereafter, Mr. Erik Quist, EODT's in-house counsel, then caused EODT to hire Caldwell as a contracts manager with duty in Iraq after Caldwell left the United States Government service and over Patton's objections that such hiring would violate the Federal Procurement Integrity Act.

123. The Complaint further alleges:

67

While the improper affair between Turner (EODT) and Caldwell (United States Government) was ongoing, EODT was awarded a six-month extension of its FOB Shield contract. The FOB Shield contract subsequently transitioned to the Rusafa Law and Order contract and became EODT's largest contract in Iraq. This $175M+ contract would not have been awarded without the support of Caldwell's contract extension, made while she was having an affair with EODT's Turner. During the prior Debarment Proceedings against EODT, senior EODT officers, including Kaye, Quist and Voland, were aware of the improper relationship between Turner and Caldwell and yet EODT decided not to disclose that relationship to the United States Army Senior Debarment Official and took no disciplinary action against Kaye, Quist or Voland for not disclosing that information. Prior to the Debarment Proceedings and after the government's investigation of EODT, Turner improperly acquired a copy of the United States government's classified investigation report. Senior EODT officers, including Kaye, Quist and Voland, were aware of Turner's improper possession of classified government documents but took no disciplinary action against Turner. Nor did EODT notify the United States government of EODT's improper misappropriation of classified federal documents. Nor did EODT assert that this constituted the appearance of impropriety.

124.    The Complaint also asserts:

An EODT logistics employee, Jason Kidd, raised concerns to the EODT management about EODT's compliance with the International Traffic in Arms Regulations (ITAR) after finally receiving the ITARs training he had requested. Quist, EODT's Chief Counsel and ITAR representative, conducted a meeting with this employee's supervisor and others. When the employee and his supervisor informed Quist that EODT needed to self disclose certain violations of ITAR, Quist stated that was not going to happen and that EODT was going to destroy all the equipment and documentation for the items that were shipped in violation of ITAR and then determine what self disclosure, if any, might be needed. Upon information and belief, EODT has taken no disciplinary action against Quist, self disclosed said violations or asserted that these actions by Quist constitute the appearance of impropriety.

125.    This same Complaint also asserts in-part:

Burger, (Chairman of the Board), Kaye, Quist, Bruce Bowland

68

("Bowland") EODT's Former Finance Director), Voland, and Lisa Jacobson (EODT's Chief Financial Officer) overcharged the United States Army Corps of Engineers-Huntsville (USACE-H) on its awarded time and materials contracts over several years by falsely inflating EODT's indirect corporate costs, which in turn were charged to USACE-H. EODT charged Burgers' time as corporate indirect on USACE-H time and materials contracts when Burger did not work at EODT. During 2008, Burger rode his bicycle across the United States while serving as "Chairman of the Board." Jacobson admitted to Patton in December 2008 that she had informed Burger he would have to start coming into the office starting in January 2009 on a regular basis or they could no longer charge his $200,000 annual salary as indirect to the United States Government. She also admitted that EODT would not be informing the Corps of Engineers about the previous years Burger had charged his time without working at the office and EODT would not be reimbursing the government for those funds.

126.    The Complaint also asserts that:

Bowland (EODT's former Director of Finance) and Kaye paid cash to the Iraqi Ministry of Finance officials in 2006 through EODT's Iraqi sub-contractor, Al Hurea, to allow EODT to settle its tax liability with the Iraqi Ministry of Finance for approximately 10% of the owed tax, significantly reducing EODT and its principal's corporate tax liability. Bowland initiated a Purchase Order from EODT which Matt Kaye approved requiring EODT's Finance department to pay Al Hurea nearly $130,000 in cash when EODT's tax liability was over $1M USD. Representatives from Al Hurea paid the Iraqi Ministry of Finance officials in cash an unknown amount and in turn received a letter stating that all EODT taxes were paid in full. In addition, Kaye, Voland, Quist and EODT's Jeremy Duncan paid cash to Iraqi Ministry of Interior government officials in 2008, again through their Iraqi subcontractor Al Hurea, to approve EODT's security license and delay approval of EODT's largest competitors' license (SOC-SMG) to engage in security services in Iraq. This caused some of their competitor's government security contracts in Iraq in 2009 to be transferred to EODT because their license was not yet approved. [Emphasis added].

127.    The allegations contained in paragraphs 101 through 126 involve illegalities that

69

EODT had a duty to disclose to the U.S. government. Additionally, with full knowledge of the aforesaid, Defendant continued to certify its compliance with U.S. law and regulations as a condition of its participation in federal programs and as a condition of it submitting invoices to the U.S. government. These certifications constitute false statements made to get false or fraudulent claims paid under 31 U.S.C. § 3729(a)(2).

## E. GSA - Failure to Charge U.S. Lowest Price on Commercial Sales of Green Targets

128. Defendant's green target business is the retail business where Defendant sells environmental friendly green targets to the U.S. Government, to foreign governments, and to other commercial businesses/subcontractors. EODT has been selling green targets for the last three or four years and the current sales volume is approximately Six Million Dollars ($6,000,000.00) per year. In or about September/October 2009, Relator discovered that EODT did not sell its targets at consistent prices and that it did not sell its targets to the U.S. Government at or below the price offered to others.

129. Relator noticed discrepancies with respect to the pricing on the green targets going back into September/October, 2009, and asked who was the central point of contact with EODT for the GSA contract, because Relator wanted to sit down with that person and go over the terms and conditions of the contract because he started to see things that were wrong with it. Relator was told by Matt Hughes that person was Eric Quest, who is the corporate counsel. Relator's response to this was, "Why was corporate counsel managing the GSA contracts?" Relator had a discussion with Matt Hughes about the pricing, probably around November, when Matt Hughes showed him the way EODT had put together the GSA scheduled pricing. It was overly complex for a GSA contract. It

70

should have been very simple. EODT does not have a simplistic pricing process. They have a very complex and ambiguous pricing model. This is when Matt Hughes told the Relator that he did not manage the contract. Relator told him that he bid and performed the contract. Matt Hughes said, "Yes, but every bid of all the contracts with GSA is in Eric Quest's office, under lock and key, and there is no way to review it." Relator said, "We cannot get very far then."

130.    Relator told the CFO, Lisa Jacobson, in or about January 2010 that he discovered that there were no commercial price lists for any of EODT's items on the green target list that were being offered under GSA Scheduled Contracts in the green target arena. She said, "Why not?" Relator asked the Program Manager, Matt Hughes, "why we do not have a commercial price list?" Matt Hughes, told Relator that they never had one. This is a fundamental business problem, because under the GSA Contracts, the GSA considers themselves to be the most favored customer, and so EODT should be extending GSA the most favorable pricing, and it has to certify that the U.S. Government is receiving the most favorable pricing, but if EODT sells an item commercially to another customer at a lower rate than the GSA rate, then the GSA Contract has to be amended and the prices reduced. This became an issue when the Relator noticed, in or about January 2010, on the green target orders that were being sold to the Canadian Government that they were being sold less than what was being offered the U.S. on the GSA Contracts. The first items were sold to the Canadian Government in the November/December time frame.

131.    In a strategy session back in January, Relator said, "Listen, we have another fundamental problem in the green target business that we are offering our targets at prices that are below our GSA Contract and we do not have a commercial price list to validate the rates we have

71

published and approved on our GSA contract." The Program Manager, Matt Hughes, states that he prices the targets using an "open market rate." The Program Manager, Matt Hughes, comes up with a "competitive price" and bids it, but without any consideration for the GSA pricing. During this planning session, Relator told Lisa Jacobson that EODT needed to develop a commercial price list and stick to those prices for all customers outside the GSA Contracts. EODT commercial price list would essentially be "fair market rates," but higher than what we were selling to the GSA.

132.　The green target retail sales are run by Matt Hughes, the Program Manager. It has its own organizational structure and account structure, and it has its own P&L, and it issues all the business invoices for green target. Matt Hughes knows his business well, and he typically sends unsolicited letter contract proposals all over the Government, and then allows the Government to accept, reject or negotiate them. Matt Hughes may send out two hundred (200) letter proposals that are at or below GSA pricing.

133.　In the staff meetings in January 2010, with the CFO and the three Finance Directors, the best price issue was discussed in the open and it was agreed that this was a problem, and that not giving the Government the "best price," and that this is fundamentally wrong, but this did not occur. The CFO's response was, the best way to correct this going forward is to find a Pricing Manager. Relator believes that nothing has been done to correct this issue and it will continue to be a problem going forward, and it will be "business as usual." Relator believes that if green sales to the U.S. Government were audited during the past five (5) years, it would reveal that EODT has not been giving the U.S. Government the 'best prices" on its green sales while certifying otherwise, resulting in gross over charges to the U.S. Government.

134.     The Relator would estimate the difference between what has been charged to the U.S. Government versus others is about ten percent (10%).  In other words, the U.S. government was being charged about ten percent (10 %) more.  The total green sales gross is about Six Million Dollars ($6,000,000.00) of which about five million five hundred thousand dollars ($5,000,000.00) would be to the U.S. Government.  Using this figure and the ten percent (10 %) difference, it is estimated that the U.S. Government is being over charged by approximately five hundred and fifty thousand dollars ($550,000.00) per year.

## COUNT I

[False Claims Act—Presenting False or Fraudulent Claims to
the United States, 31 U.S.C. § 3729(a)(1)]

135.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 134 above.

136.     EODT presented to the United States for payment or approval the false or fraudulent claims described above, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

137.     Plaintiff United States has sustained damages as a result of EODT's false claims in an amount to be determined at trial.

## COUNT II

[False Claims Act—Making or Using a False Record or Statement to Get a False or Fraudulent
claim Paid or Approved, 31 I.S.C. § 3729(a)(2)]

138.     Plaintiff incorporates the allegations contained in Paragraphs 1 through134 above.

139.     EODT made, used, or caused to be made or used, the false records and statements described above to get its false and fraudulent claims for payment paid or approved by the United

73

States, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

140. Plaintiff United States has sustained damages as a result of EODT's false records and statements in an amount to be determined at trial.

## COUNT III

[False Claims Act—Making or Using a False Record to Conceal, Avoid or Decrease an Obligation to Pay Money to the United States, 31 U.S.C. § 3729(a)(7)]

141. Plaintiff incorporates the allegations contained in Paragraphs 1 through 134 above.

142. By virtue of the conduct described above, EODT made or used false records and statements to conceal, avoid or decrease obligations to pay or transmit money to the United States, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard of their truth or falsity.

143. Plaintiff United States has sustained damages as a result of EODT's false records and statements in an amount to be determined at trial.

## COUNT IV

[Unjust Enrichment]

144. Plaintiff incorporates the allegations contained in Paragraphs 1 through 134 above.

145. EODT has been unjustly enriched by reason of its submission of requests for payment of unallocable and unallowable costs to which it was not entitled, and by its receipt and retention of such payments. In equity and good conscience, EODT should not retain those payments. As a result of EODT's conduct, Plaintiff has sustained damages in an amount to be determined at trial.

74

## COUNT V

### [Breach of Contract]

146. Plaintiff incorporates the allegations contained in Paragraphs 1 through 134 above.

147. As a result of the aforesaid, EODT has been breached its contracts with the U.S. by reason of its submission of requests for payment of unallocable and unallowable costs to which it was not entitled, and by its receipt and retention of such payments.

148. As a result of EODT's conduct, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT VI

### [Common Law Fraud]

149. Plaintiff incorporates the allegations contained in Paragraphs 1 through 134 above.

150. EODT made false material representations to Plaintiff with knowledge of their falsity, and concealed facts that EODT was under a duty to disclose, with intent to defraud Plaintiff. EODT intended that Plaintiff act in reliance upon these representations and nondisclosures.

151. Plaintiff relied upon EODT's false representations and nondisclosures, and was unaware of the true facts.

152. As a result of EODT's conduct, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT VII

### [Negligent Misrepresentation]

153. Plaintiff incorporates the allegations contained in Paragraphs 1 through 134 above.

75

154. EODT negligently and without due care made false material representations to Plaintiff, and intended that Plaintiff act in reliance upon these representations.

155. Plaintiff relied upon EODT's false representations, and would not have acted as it did if it had known the true facts.

156. As a result of EODT's conduct, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT VIII

157. The Relator, Patrick Griffis, re-alleges the allegations of Paragraphs 1 through 134 as though specifically set out.

158. The Relator, Patrick Griffis, was fired in retaliation for his oppositional activities, including the gathering of documents pertinent to pursuing a False Claims Act case, and/or for refusing to violate the law, and/or for blowing the whistle on Defendant's illegal activities, and as a result, he was fired.

159. As a result of the aforesaid, the Relator, Patrick Griffis, was wrongfully fired, and he sues the Defendant, EOD Technology, Inc., pursuant to 31 U.S.C. § 3730(h), Tennessee Common Law for termination in violation of Public Policy, and pursuant to Tennessee Code Annotated § 50-1-304.

160. As a result of the wrongful termination, the Relator suffered and will continue to suffer a loss of wages and benefits, emotional distress, humiliation and embarrassment, and an injury to his capacity to earn.

161. Relator, Patrick Griffis, alleges that Defendant's actions were intentional and reckless

76

and in conscious disregard of her rights such as to justify the imposition of substantial punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against EOD Technology, Inc. as follows on all Counts:

(a)  On Count I, treble the amount of actual damages sustained by the United States, plus such civil penalties as are allowable by law, and for such forfeitures as are allowable by law, together with costs, interest, and reasonable attorney fees;

(b)  On Count II, treble the amount of actual damages sustained by the United States, plus such civil penalties as are allowable by law, and for such forfeitures as are allowable by law, together with costs, interest, and reasonable attorney fees;

(c)  On Count III, treble the amount of actual damages sustained by the United States, plus such civil penalties as are allowable by law, and for such forfeitures as are allowable by law, together with costs, interest, and reasonable attorney fees;

(d)  On Count IV, for actual damages, together with costs and interest;

(e)  On Count V, for actual damages, together with costs and interest;

(f)  On Count VI, for actual damages, punitive damages, together with costs and interest;

(g)  On Count VII, for actual damages, punitive damages, together with costs and interest;

(h)  On Count VIII, for compensatory damages, back pay and fiont pay, punitive damages, together with costs, attorney fees and interest;

(i)  And for such other and further relief as the Court may deem just and equitable.

77

(j)     For the Defendant to be ordered to cease and desist from submitting false claims and to comply fully with the statutes and regulations of the United States.

(k)     For Defendant to be barred from participating in Federally funded programs.

(l)     Relator further requests that he be awarded the maximum amount permitted pursuant to 31 U.S.C. § 3730(d) and T.C.A § 71-5-183, *et seq.*

(m)     Relator requests all costs, including court costs, expert fees, investigative expenses, and attorney's fees incurred by Relator in the prosecution of this suit.

JURY TRIAL DEMANDED.

Dated:   May __4th__, 2010.

By: _____
David A. Burkhalter, II
Ronald A. Rayson
BURKHALTER, RAYSON & ASSOCIATES
111 S. Central Street, P.O. Box 2777
Knoxville, TN 37901
(865) 524-4974 Phone
(865) 524-0172 Facsimile

78

CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document was served upon counsel of record by placing same in the United States mail this the ___5th___ day of May, 2010 with proper postage affixed thereto, addressed to the following:

Eric H. Holder, Jr.
United States Attorney General
U.S. Department of Justice
10th & Constitution Avenues, N.W.
Washington, D.C. 20530
**Attn: United States False Claims Act filing**

James R. "Russ" Dedrick
United States Attorney for the Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, TN 37902
**Attn: United States False Claims Act filing**

David A. Burkhalter, II

79