UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>PATRICK GRIFFIS, and PATRICK GRIFFIS,<br>individually,<br><br>     Plaintiffs,<br><br>v.<br><br>EOD TECHNOLOGY, INC. (N/K/A JANUS<br>GLOBAL OPERATIONS LLC),<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)     No. 3:10-CV-204-TRM-DCP<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Relator's Motion to Compel and for Sanctions [Doc. 262]. Defendant responded in opposition [Doc. 273], and Relator filed a reply [Doc. 278]. The parties appeared before the Court on August 10, 2024, for a motion hearing. Attorneys Richard Rose and Shahin Assandia were present on behalf of Relator ("Relator" or "Mr. Griffis"). Attorneys Alex Hassid, Jennifer Short, and David Eldridge were present on behalf of Defendant ("Defendant" or "EODT"). For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 262**].

## I.       BACKGROUND

Pursuant to Federal Rules of Civil Procedure 30, 34, and 37(a)(3)(B), Relator seeks an order (1) compelling Defendant to produce documents in response to Relator's Fifth Requests for Production of Documents, and (2) sanctioning Defendant for failing prepare its Rule 30(b)(6)

witness [Doc. 262]. Specifically, with respect to the former request, Relator seeks documents relating to Defendant's present financial condition and "all agreements between [it] and individuals known as Other Country Nationals ['OCNs'] pursuant to which such individuals were expected to or did perform services on the Rusafa Rule of Law Contract, Contract No. W91GY0-07-C-0053" [Doc. 262 p. 2 (citation omitted)]. With respect to the Rule 30(b)(6) deposition, Relator argues that Defendant was not prepared to testify about Defendant's financial condition, Relator's employment benefits, and Defendant's use of OCN labor and amounts of costs [Doc. 262 pp. 8–17].

On August 5, 2024, the parties submitted a Joint Status Report on the motion [Doc. 307]. The parties' Joint Status Report states that Defendant has now revised its written objections and responses to Relator's document requests and has produced agreements between Defendant and OCNs on the Rusafa contract [*Id*. at 1]. "On August 2, 2024, Relator identified to [Defendant] a number of additional potential OCN personnel for whom [Overseas Services Agreements] were not produced" [*Id*. at 1–2]. "[Defendant] is conducting additional searches and will produce any additional responsive documents it may find" [*Id*. at 3]. At the August 13 hearing, Defendant represented that it would produce any additional documents or explain why certain OCNs would not be related to the Rusafa contract within the next ten (10) days. The Court therefore finds Relator's requests for these documents moot.

The parties' Joint Status Report states that "[t]o the extent Relator's motion seeks 30(b)(6) deposition testimony from [Defendant] on Relator's new OCN allegations in the Third Amended Complaint, Relator has agreed to propose specific deposition topics on or before August 6, 2024, for [Defendant's] consideration" [*Id*. at 3]. They submit that they "are continuing to try to resolve this portion of Relator's motion, including as to timing and logistics regarding a corporate

deposition on the forthcoming OCN topics" [*Id.*]. On August 12, 2024, Defendant filed a Status Report Concerning Discovery Disputes, stating that on August 6, 2024, "Relator provided . . . [a] Rule 30(b)(6) notice, outlining 42 separate topics for testimony [Doc. 308 p. 3 (citation omitted)].[1] On August 8, 2024, Defendant asked Relator to narrow the scope of the topics and "Relator's counsel accused [Defendant] of reneging on its agreement to prepare and produce a designee" [*Id.*]. These topics, however, are not properly before the Court. The Court **ORDERS** the parties to meet and confer over the 42 topics in an effort to resolve this issue without intervention by the Court.[2]

The parties' Joint Status Report states:

> The parties have not been able to resolve the other issues in Relator's motion. These issues include Relator's request for additional 30(b)(6) testimony, documents relating to EODT's financial condition, actual costs incurred under the contracts and task orders at issue, and attorneys' fees related to said Motion, as well as the determination of location(s) for any future deposition(s).

[*Id.*].

As noted above, the parties appeared for a motion hearing on August 13, 2024. During the hearing, the Court addressed the issues regarding Defendant's document production and then turned to the issues relating to Defendant's Rule 30(b)(6) deposition. The Court will address the matters in that same order.

---

[1]     Defendant's Status Report raises other issues, such as issues with tax returns and Relator's personnel file from the Office of Personnel Management [Doc. 308 pp. 1–2]. These issues, however, are not appropriately before the Court. *See* Fed. R. Civ. P. 7(b).

[2]     Defendant argues that the deposition on the OCNs should be limited to 3.5 hours and occur remotely [Doc. 308 p. 4]. In his motion, Relator seeks to re-depose a Rule 30(b)(6) witness within the geographic scope of the Eastern District of Tennessee [Doc. 262 p. 19]. The Court **ORDERS** the parties to meet and confer regarding the necessary length and location of the deposition in light of the rulings below. The parties shall complete the deposition on or before **August 30, 2024**. To the extent they cannot agree on the length or location, they **SHALL** immediately contact Chambers.

3

## II. DOCUMENTATION PRODUCTION

The Court will require Defendant to supplement its responses with the documents that it has in its possession.

### A. Standard of Review

Federal Rule of Civil Procedure 26(b)(1) provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Courts have explained that the "scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (quoting *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)); *see also Burrell v. Duhon*, No. 518CV00141, 2019 WL 5260481, at *2 (W.D. Ky. Oct. 17, 2019) ("The spirit and purpose of the Federal Rules of Civil Procedure demonstrate that the relevance threshold is a relatively low one." (citation omitted)).

Courts have cautioned, however, that "[d]iscovery requests are not limitless, and parties must be prohibited from taking 'fishing expeditions' in hopes of developing meritorious claims." *Bentley v. Paul B. Hall Reg'l Med. Ctr.*, No. 7:15-CV-97-ART-EBA, 2016 WL 7976040, at *1 (E.D. Ky. Apr. 14, 2016). "[T]he [C]ourt retains the final discretion to determine whether a discovery request is broad or oppressive." *Id.* (citing *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)).

Under Rule 37(a), a party may move to compel discovery of relevant information. *Shelbyville Hosp. Corp. v. Mosley*, No. 4:13-CV-88, 2017 WL 1155046, at *2 (E.D. Tenn. Mar. 27, 2017) (citing Fed. R. Civ. P. 37(a)). The party moving to compel "bears the initial burden of proving that the information sought is relevant[.]" *Id*. (quoting *Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010)). Once the party shows relevancy, "the burden shifts to the party resisting discovery to demonstrate 'why the request is unduly burdensome or otherwise not discoverable.'" *First Horizon Nat'l Corp. v. Houston Cas. Co.*, No. 2:15-CV-2235-SHL-DKV, 2016 WL 5869580, at *4 (W.D. Tenn. Oct. 5, 2016) (quoting *Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 310 (W.D. Tenn. 2008)).

### B. Analysis

Relator states that "the documents sought in Request Nos. 1, [4–8] relate to Defendant's present financial condition, and are[,] therefore relevant to Relator's punitive damages claim" [Doc. 262 p. 3 (citation omitted)].

Defendant contends that it complied with its discovery obligations [Doc. 273 pp. 11–13]. It states that "all of these Requests relate exclusively to [Relator's] punitive damages demand and have no other bearing on the merits of the case" [*Id*. at 11 (citation omitted)]. It explains that it has already "produced the 2022 and 2023 financial statements and 2022 tax returns (from [its] parent company, which is all that exists)" [*Id*. at 11–12 (citation omitted)]. But Defendant argues that Relator seeks additional documents [*Id*. at 12]. "For example, RFP No. 4 seeks 'the workpapers used to prepare' [Defendant's] consolidated tax returns, and RFP Nos. 5 and 8 seek documents related to management fees and capital contributions referenced in [Defendant's] tax return" [*Id*. (citation omitted)]. Defendant argues that "Relator is not entitled to such materials, particularly insofar as they relate to [Defendant's] parent and affiliate companies who are not

5

parties and have no connection to this action" [*Id.* (citation omitted)].  Further, Defendant argues that "Ms. Graham's testimony also confirmed that documents responsive to RFP Nos. 1, 6, and 7 have either been produced or do not exist" [*Id.*].

Relator replies that Defendant has not produced any information about itself but instead produced information about its parent company, Acuity Holdings, LLC [Doc. 278 p. 9].  According to Relator, "[Defendant] is a separate corporation with separate income from its government contracts, and accordingly, documents showing [Defendant's] financial stability (or alleged lack thereof) certainly exist" [*Id.* at 10].  He complains that he "has been forced to ask for breakdowns of management fees, capital contributions and other documents related to Acuity Holdings, LLC's financial documents, because the produced documents do not delineate information for [Defendant]—all of which Relator is interested in" [*Id.*].

The topics at issue provide:

> 1. Please provide all documents relating to your finances and/or financial condition provided to the United States Government, or any agency or representative of the United States Government, in connection with your efforts to obtain awards of the contracts identified on Exhibit "A," attached hereto.

> 4. Documents and workpapers used to prepare Acuity Holdings, LLC's consolidated tax returns and financial statements reflecting how EODT n/k/a Acuity Janus, LLC, and predecessor or successor entities, are consolidated into Acuity Holdings, LLC for tax returns and financial statements for the time period 2020 through 2023.

> 5. Documents – including but not limited to accounting books, workpapers, and/or schedules – reflecting how management services fees that were received by or paid by Acuity International, LLC or Acuity Holdings, LLC were allocated among either of their members during the period January 1, 2020 through December 31, 2023.

6. Documents – including but not limited to accounting books, workpapers, and/or schedules – reflecting intercompany transfers or loans, i.e., transfers or loans between EODT and any other related entity(ies), including but not limited to Acuity International, LLC and/or Acuity Holdings, LLC, between January 1, 2020 and December 31, 2023.

7. Documents – including but not limited to accounting books, workpapers, and/or schedules – reflecting earnings distributions to members, partners, or investors of EODT and any related entity, including but not limited to Acuity International, LLC and Acuity Holdings, LLC, for the period January 1, 2020 through December 31, 2023.

8. Documents – including but not limited to accounting books, workpapers, and/or schedules – reflecting capital contributions to EODT between January 1, 2020 and December 31, 2023.

[Doc. 262-1 pp. 5–6].

At the hearing, Relator argued that Defendant merely provided its parent company's information, but it needed information about Defendant. According to Relator, Plaintiff's Rule 30(b)(6) witness testified that Defendant had trial balances. Defendant responded that the referenced trial balances were those used to prepare the consolidated financials already produced, it does not possess separate documents from Acuity Holdings, LLC, and the documents Relator seeks does not exist. Defendant further explained that Plaintiff's Rule 30(b)(6) witness did not testify that Defendant itself had trial balances but instead, she was referring to the parent company. Defendant stated that it does not track its net worth and that in order to arrive at a net worth, an expert would need to calculate that number. Defendant represented to the Court that it did not have what Relator seeks, but it offered to provide the revenue of the two government contracts under which it is currently providing services.

It is well settled that "Rule 34 requires a party to produce documents that already exist and a party does not have to create a document in response to a request for production." *Harris v.*

7

*Advance Am. Cash Advance Centers, Inc.*, 288 F.R.D. 170, 174 (S.D. Ohio 2012) (citations omitted). Based on Defendant's representations to the Court, it does not have the documents that Relator seeks. The Court has reviewed Maura Graham's testimony, Defendant's Rule 30(b)(6) witness, and it appears that when she referred to "trial balances," she was referring to Acuity Holdings, LLC, and not to Defendant [Deposition of Maura Jane Graham pp. 55–56 ("Graham Depo.")].[3] In order to provide a more detailed view of Defendant's revenue, however, it offered to produce documents showing its revenue on current government contracts. The Court **ORDERS** Defendant to produce those documents within **FIVE DAYS** but declines to order it to produce any additional documents.

## III. RULE 30(B)(6) DEPOSITION

The Court finds that Ms. Graham was not prepared to testify about Defendant's financial condition and that she was improperly instructed not to testify about Relator's bonus eligibility. The Court will therefore order Defendant to be re-deposed on these topics. The Court declines to order sanctions for Defendant's inability to testify about specific costs incurred on the contracts.

### A. Standard of Review

The deposition of a corporate representative is governed by Rule 30(b)(6), which provides in relevant part:

> The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination. A subpoena must advise a nonparty organization of its duty to confer with the serving

---

[3] Defendant filed her deposition under seal [Doc. 275 SEALED]. But as noted at the hearing, the parties did not file many of the pages that the Court needs for an accurate review. At the hearing, Relator submitted the entire transcripts of Defendant's Rule 30(b)(6) witnesses—Maura Graham and Lisa Jacobson. The Court will cite to these deposition transcripts in the instant Memorandum and Order.

party and to designate each person who will testify. The persons designated must testify about information known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6); *Sylvester v. Safeco Ins. Co. of Am.*, No. 422CV00140, 2024 WL 1119429, at *2 (W.D. Ky. Mar. 14, 2024) (citation omitted). This rule "imposes burdens on both the discovering party and the designating party." *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012).

The party seeking a Rule 30(b)(6) deposition "must describe the matters to be explored in the deposition with 'reasonable particularity' sufficient to enable the responding corporation or business entity to produce a representative witness who can testify to the entity's knowledge on the topics so identified." *Alvey v. State Farm Fire & Cas. Co.*, No. 517CV00023TBRLLK, 2018 WL 826379, at *3 (W.D. Ky. Feb. 9, 2018) (citation omitted). "The test for reasonable particularity is whether the request places the party upon 'reasonable notice of what is called for and what is not.'" *Id*. at *7 (quoting *St. Paul Reinsurance Co. v. Comm. Fin. Corp.*, 198 F.R.D. 508, 514 (N.D. Iowa 2000)).

With respect to the responding organization, "it is obligated to produce a witness or witnesses knowledgeable about the subjects described in the notice and to prepare the witness or witnesses to testify not simply to their own knowledge, but the knowledge of the corporation." *Schnatter v. 247 Grp., LLC*, 343 F.R.D. 325, 331 (W.D. Ky. 2022) (citation omitted). "Absolute perfection is not required of a 30(b)(6) witness[,]" and "[t]he mere fact that a designee could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation." *QBE Ins. Corp.*, 277 F.R.D. at 691 (citation omitted).

The party claiming that a corporate representative was unprepared "must make at least an initial showing—with record citations—suggesting that the designee's preparation was inadequate." *Wicker v. Lawless*, 278 F. Supp. 3d 989, 1000 (S.D. Ohio 2017) (citation omitted).

In determining whether a witness was unprepared, the Court must compare the noticed topics to the deposition testimony. *Id*. (citation omitted).

## B.     Analysis

Relator asserts that Defendant was not prepared to testify about Defendant's financial condition or Relator's employment benefits [Doc. 262 p. 8]. In addition, Relator argues that Defendant was not prepared to testify about the amounts of costs incurred on the contracts [*Id*. at 14–17]. He states that Defendant should be sanctioned for not preparing a Rule 30(b)(6) witness, which should include an award of traveling costs and attorney's fees associated with Relator's first deposition, an award of costs for the motion, and an order compelling Defendant to produce a prepared witness within the geographic bounds of the Eastern District of Tennessee [Id. at 18–19]. At the hearing, Relator clarified that he does not want to re-depose a Rule 30(b)(6) witness on the costs incurred but rather he seeks an order precluding Defendant from presenting such information at trial.

The Court will address these arguments separately.

### 1.     Defendant's Financial Condition

Relator claims that Ms. Graham was not prepared to testify as to Defendant's financial condition [Doc. 262 p. 8]. Defendant responds that she was prepared to testify and that "Relator cherry-picks from her deposition transcript to provide out-of-context answers that misleadingly suggest Ms. Graham was unprepared or refused to testify about [Defendant's] financial condition as noticed in Topic [Nos.] 75–80" [Doc. 273 p. 16]. With respect to the 2023 consolidated financial statement and the 2022 consolidated tax return, "she offered context regarding the company's audited financial statements, including how the company prepared these documents using the company's internal accounting systems, testified as to [Defendant's] assets, liabilities

10

and net profits on current contracts, and confirmed the absence of any intercompany loans to or from [Defendant]" [*Id.* (citations omitted)]. Further, it states, Ms. Graham testified that Defendant's net worth is not "a metric that is tracked" and that "such a calculation would require an expert due to the complicated manner in which [Defendant's] finances are consolidated with its parent and affiliates" [*Id.* (citation omitted)]. Defendant asserts that "[a] mathematical calculation that must be performed by an expert is beyond the obligations of a Rule 30(b)(6) witness to prepare" [*Id.* (citations omitted)]. Given that, Defendant argues, "her preparation to relay that unavailability satisfied [Defendant's] obligations" [*Id.* at 17 (citation omitted)]. And Defendant states that "Ms. Graham testified regarding the revenues from [Defendant's] only currently awarded government contracts, representations of financial condition [Defendant] made to the government, assets, liabilities, and distributions to members, partners, or investors" [*Id.* (citations omitted)].

Defendant designated Ms. Graham as its witness on Topic Nos. 75–80. These topics state:

75.    EODT's net worth from 2020 through current date.

76.    EODT's audited financial statements, tax returns, source of income, and current debt.

77.    EODT's representations of its financial condition to the Government in 2023.

78.    EODT's representations of its financial condition to its lenders in 2023.

79.    The contents of the documents and workpapers used to prepare Acuity Holdings, LLC's consolidated tax returns and financial statements reflecting how EODT n/k/a Acuity Janus, LLC, and predecessor or successor entities, are consolidated into Acuity Holdings, LLC for tax returns and financial statements for the time period of 2020 through 2023.

11

80. Testimony regarding intercompany transfers or loans, *i.e.*, transfers or loans between EODT and any other related entity(ies), including but not limited to Acuity International, LLC and/or Acuity Holdings, LLC, between January 1, 2020, and December 31, 2023.

[Doc. 262-4 pp. 14–15]. Ms. Graham testified that in preparing for the deposition she "reviewed the company's discovery response – some of the company's discovery responses and some of the pleadings in this litigation" [Graham's Dep. p. 12]. She signed interrogatories, and she investigated Defendant's document preservation [*Id*.]. She also spoke with Acuity' employees from its financial department [*Id*. at 11]. She testified about Defendant's assets and liabilities but was not able to testify about specific assets [*Id*. at 50–52]. She further testified how the consolidated financial reports were generated [*Id*. at 53]. During the deposition, the following exchange occurred:

Q:    Okay. Does the defendant file a separate tax return?

A:    The tax return that was provided is the tax return that's filed.

Q:    Okay. And does the defendant have any sources of income in 2022 or 2023?

A:    I think I would refer you to the consolidated financial reports and the tax returns for that information.

Q:    Okay. But you understand those documents don't break out the financial condition of the defendant in this case. Do you understand that?

A:    I would just – again, the documents speak for themselves.

[*Id*. at 54–55]. She later testified:

Q:    Okay. Well, how can I tell – you understand that there's a punitive damages count in this complaint, which at relevance, per the judge's order, is the financial net worth of the defendant in this case, Acuity- Janus Global Operations, LLC. Are you aware of that?

A:     Yes.

Q:     Okay. And can you tell me anything about the finances of the defendant in this case, what assets it has, what liabilities it has, what sources of income it has? Are you prepared to tell us anything about that today?

A:     I would refer you to the information that's contained in the consolidated financial report and the tax returns that have been produced.

[*Id*. at 56].

With respect to Topic No. 75, Relator's counsel asked her to look at Exhibit 704 and identify the net worth of Defendant, and after counsel for Defendant objected to the question as being outside the scope, Ms. Graham testified, "I think that is beyond the scope of what I've been designated to testify about.  That information may be able to be extracted from here, but I don't have anything to add beyond what's contained in here." [*Id*. at 57].  Further, during her deposition, the following exchange occurred:

Q.     Do you know what the net worth of Acuity-Janus Global Operations, LLC is in 2022—was in 2022?

A.     That is not a metric that is tracked by the company.

Q.     Okay. But Acuity-Janus Global Operations, LLC is a separate entity that exists today, correct?

A.     Yes.

Q.     Does it have a separate set of books?

A.     I – I don't – I don't know.

Q.     You don't know if there's a corporate set of books for Acuity-Janus Global Operations, LLC?

A.     I don't believe there is.

Q.     And does Acuity-Janus Global operations, LLC have a bank account?

13

A.     I don't have the information.

MR. HASSID:  So let me just object here.  Counsel, what is this –
what topic is this related to?

MR. ROSE: 75.

MR. HASSID: 75 is net worth.  Whether there's a bank account is -
- is not relevant, so the witness may not be prepared on things that
are far afield from what the topic is.  I'm not going for [sic] stop you
from asking about it.  I'm just putting that on the record, and the
witness can answer if she has personal knowledge.

[*Id*. at 49–50].  Attorney Rose later inquired, and Ms. Graham testified:

Q.     Okay. When you say it's beyond the scope, you agree that
you've been designated for Topic 75, "EODT's net worth
from 2022 [sic] through current date"?  You understand that?

MR. HASSID: Object.  Object to form.  Calls for a legal conclusion.
Go ahead.

THE WITNESS: Yes, and that is not a number that -- a metric that
is tracked for Acuity-Janus Global Operations, LLC.

BY MR. ROSE:
Q. Okay. Can -- can it be tracked? Can they produce it?

MR. HASSID: Object to form.

THE WITNESS: That is not a metric that is tracked.

[*Id*. at 58].  Ms. Graham further testified about distributions in 2022 and 2023 to members,

partners, or investors [*Id*. at 61].

She was not sure whether Acuity-Janus Global Operations, LLC has a separate set of books

or its own bank account [*Id*. at 49].  Attorney Rose asked about Defendant's accounts receivables,

and Ms. Graham stated that topic was beyond the scope of her designated topics, she did not have

that information, and that she could only testify about Acuity Holdings, LLC [*Id*. at 64].  After a

break, Ms. Graham stated that she had contacted the Chief Financial Officer ("CFO"), who was

14

able to explain Defendant's assets [*Id*. at 67–68].  He also relayed the revenue from these assets, but Ms. Graham was not able to explain how he arrived at the calculation [*Id*. at 69].  She also confirmed with the CFO that the net worth of Defendant is not a metric that is tracked [*Id*. at 70].

During the hearing, Relator maintained that Ms. Graham was not prepared on the designated topics.  He stated that during Ms. Graham's deposition, she had to contact the CFO for information, and even after she had done so, she was unable to explain how he arrived at the revenue number he had relayed to her.  Defendant argued that Ms. Graham is not in finance and that the information Relator required during the deposition is not reasonably available to the organization.

After reviewing the testimony and the parties' positions, the Court finds that Ms. Graham was not prepared to testify as to Defendant's financial condition with respect to its assets and its liabilities.  Based on Defendant's representations, it appears that some of the topics (*i.e.*, net worth) are not reasonably available to the organization or would require expert testimony.  *Schall v. Suzuki Motor of Am., Inc*., No. 4:14CV-00074, 2017 WL 4050319, at *5 (W.D. Ky. Sept. 13, 2017) ("[A]designee has a duty to reasonably obtain information from corporate documents, current or prior corporate employees, or any other sources reasonably available to the corporation." (citation omitted)].  But some of the information does appear to be reasonably available.  For instance, Ms. Graham was able to generally testify whether Defendant had assets or liabilities [Graham Dep. pp. 50–51], but she was not able to provide specifics when asked [*id*. at 51–52].  Indeed, she called the CFO during the recess to clarify some answers, which seems to indicate that such topics are reasonably available to Defendant [*Id*. at 67].  And while she was able to provide Defendant's revenue, she could not explain how the CFO arrived at that specific number [*Id*. at 68–69].  The

15

Court therefore finds that Ms. Graham was not prepared to discuss the information that was reasonably available to Defendant.

## 2.    Relator's Employment Benefits

Relator claims that Ms. Graham was not prepared to testify on his employment benefits and that Attorney Hassid improperly instructed Ms. Graham not to answer a question during this portion of the deposition [Doc. 262 p. 13 & n.2 & 3]. Defendant argues that Relator "badly mischaracterizes her testimony" [Doc. 274 p. 17]. According to Defendant, "Ms. Graham was prepared to and fully addressed those issues based on the information that is reasonably available to [it]" [*Id*. at 18]. Defendant states that Ms. Graham testified about Relator's eligibility for ESOP shares and for a cash bonus [*Id*. at 18]. Defendant argues that "Relator faults Ms. Graham for being unprepared and 'refus[ing] to discuss Relator's performance at EDOT' or the precise amount of bonus Relator would have received[,]" but "Relator's job performance . . . is plainly beyond the scope of Topic [No.] 72" and bonuses are discretionary [Id. at 18 (alterations in original)]. Defendant states that its counsel's instruction to not answer was appropriate [*Id*. at 18 n.12].

Relator replies that Topic No. 72 pertained to his eligibility for a bonus [Doc. 278 p. 4]. He assets that "Ms. Graham should have been prepared to discuss whether Relator's performance was on track for a bonus," and "could have looked at documents (e.g., Relator's personnel file, which [Defendant] has in its possession) to determine whether Relator was eligible for a performance-based bonus, but she did not do so" [Doc. 278 p. 4].

Topic No. 72 seeks "Mr. Griffis'[s] ESOP and bonus eligibility at EODT and the amount of such benefits" [Doc. 262-4 p. 14]. Ms. Graham stated that she was preprepared to testify about Topic No. 72 [Graham Dep. p. 31]. She was asked "when would [Relator] have been entitled to ESOP shares?" [*Id*.]. Ms. Graham explained: "He would have been entitled on the day --he would

16

have been eligible on the day he became an employee as long as he was 18, worked a thousand hours, and was still employed as of December 31st of that given year [*Id.* at 31–32]. She explained that "[t]he qualifying criteria was 1,000 hours of work and continued employment on the last day of the year in which those hours were earned" [*Id.* at 32]. When asked if the shares build each year, she testified that "there was an ESOP committee who made the determination of what contribution would be made each year" and it would be a percentage of the employee's salary, subject to IRS caps [*Id.*]. When asked if Relator would have been eligible for a bonus, she stated that generally, "employees were eligible each year for a cash bonus[,]" which "would depend, of course, on job performance, budget[, and t]hings of that nature" [*Id.*]. She could not locate any documents that set forth the bonus criteria for employees [*Id.* at 32–33]. When asked if Relator had a good financial performance, she stated that question was beyond the scope of the designated topics [*Id.* at 33]. The following exchange occurred:

> Q      What would have been the bonus range that [Relator] would
>        have been entitled to --
>
> MR. HASSID: Object to form.
>
> BY MR. ROSE:
> Q. --   given his position.
>
> MR. HASSID: Object to form and outside the scope. But go ahead.
>
> BY MR. ROSE:
> Q.      You may answer.
>
> A.      Could you repeat the question?
>
> Q.      Yes, ma'am. What would have been the bonus range that
>         [Relator] would have been entitled to, given his position?
>
> MR. HASSID: Same objections.
>
> THE WITNESS: I believe that's beyond the scope of what I've been
> designated to testify about.

17

BY MR. ROSE:

Q.     Well, No. 72 says: [Relator's] ESOP and bonus eligibility at
       EODT and the amount of such benefits. So the amount is --
       the amount is in there.

MR. HASSID: I'm going to object, and I do believe in the judge's
order we're not required to calculate amounts. I also don't think,
based on the witness's testimony, that -- ESOP is one thing, but
bonuses would have been dependent on performance of the
company and were discretionary, so I don't know that there's a way
to calculate that. I think it's an unfair question, and I'm going to
instruct the witness not to answer.

MR. ROSE: I'm going to object to the speaking objection
instructing the witness what the answer is.

MR. HASSID: I just -- I instructed the witness not to answer, so
there's no answer coming from the witness.

MR. ROSE: You're instructing the witness not to answer?

MR. HASSID: Yes. I think this is beyond the scope.

MR. ROSE: You can't instruct the witness not to answer.

MR. HASSID: I can if it's beyond the scope.

[Doc. 275 at 33–34].

During the hearing, Relator explained that there were two issues: Relator's financial

performance and his bonus range. Relator stated that Defendant's president received a bonus, and

therefore, he would like to know whether Plaintiff was a good employee and eligible for a

performance. Relator maintained that Attorney Hassid's instruction to Ms. Graham not to answer

was not appropriate. Attorney Hassid agreed that his instruction was not proper. With respect to

bonuses, Defendant argued that all it could locate was a document from 2008—two years before

Defendant hired Relator. This document, Defendant explained, provided the range of bonuses.

Defendant stated that Ms. Graham testified regarding ESOP eligibility, which required that the

18

employee be over 18, worked at least 1,000 hours, and remain an employee at the end of the calendar year. Because Relator did not work 1,000 hours and was terminated before December 31, Defendant stated that he was not eligible for the ESOP bonus. With respect to the other bonus, Defendant argued that it was based on job and company performances. It explained that because it terminated Relator for performance issues, he was not entitled to this bonus either. Attorney Hassid stated that he instructed the witness not to answer because the answer would have been speculative but that he should have let Ms. Graham testify that Relator would not have been eligible. With respect to Relator's job performance, however, Defendant argued that this topic was subject to Topic No. 71, and it designated Lisa Jacobson to testify about it.[4]

Relator claimed that Defendant's argument consisted of testimony from the lawyer and that he is entitled to know Defendant's position on these topics. According to Relator, Lisa Jacobson testified that that Relator was very smart and earned the company money.

As Relator argued, and Defendant acknowledged, Attorney Hassid's instruction to Ms. Graham not to answer the question was inappropriate. *See* Fed. R. Civ. P. 30(c)(2). Attorney Hassid shall refrain from making improper objections in the future. Topic No. 72 seeks information about the amount of Relator's ESOP and bonus eligibility benefits. In light of Attorney Hassid's objection, Ms. Graham did not provide an amount. The Court acknowledges, as the parties seem to agree, Defendant's response may likely be zero because he was purportedly not eligible to receive a bonus due to his termination before the end of the year. But Relator was not provided with Defendant's position, and therefore, allowing Relator to briefly inquire about the amount of Relator's benefits is appropriate.

---

[4] The Court has reviewed Lisa Jacobson's testimony on Topic No. 71. She generally testifies that an employee lodged a complaint against Relator for not providing information on a timely and consistent basis and that Relator missed meetings and was not available when he said he would be available [Deposition of Lisa Jacobson pp. 169–72].

### 3. Incurred Costs

Relator asserts that Defendant designated Lisa Jacobson to testify about "Defendant's costs incurred on the various at-issue contracts and task orders, including topics relating to Defendant's use of, and costs incurred for, OCN labor on the at-issue contracts and task orders" [Doc. 262 p. 14 (footnote omitted)]. According to Relator, Topic No. 12 includes the costs incurred under the at-issue contracts and tasks orders [*Id*. at 15]. Ms. Jacobson testified, Relator states, that she was not prepared to testify about specific amounts [*Id*. at 16]. Relator argues that defense counsel stated that Defendant "had no obligation to produce a prepared witness to testify to actual dollar amounts of incurred costs," but the Court never limited this topic in this manner [*Id*.]. Relator states that "[defense] counsel did ultimately offer to provide those at a later time if the parties could reach a stipulation[,]" but further explains that he needs "both costs and testimony about costs as outlined in the notice" [*Id*.]. According to Relator, "Defendant also conceded that preparation of topics 23–27 'slipped through the cracks' and that Ms. Jacobson was simply unprepared to speak on those topics" [*Id*. at 17 n. 6].

Defendant responds that "Ms. Jacobson's inability to testify as to these specific amounts was not the result of a willful lack of preparation but was instead due to the limited time [Defendant] had to prepare its corporate designees, the lack of reasonably available information that would enable [Defendant] to respond to those questions, and certain requests being fundamentally unanswerable" [Doc. 273 p. 20]. Defendant states that "[f]or instance, Ms. Jacobson was asked, in a single question, if she could tell Relator's counsel 'the amounts of the local national or [third] country national and other country national labor costs on Rusafa, to which she replied '[w]ith unlimited time, yes. I mean that's not something I had time to prepare for'" [*Id*. (citations omitted)]. She also explained why she could not testify about indirect costs [*Id*.].

As to Topic No. 12, Defendant argues that its "accounting system did not consistently track costs incurred by labor type (i.e., LN, TCN, or OCN), nor was [Defendant] required to do so" [*Id.* (citation omitted)]. Defendant explains that "it did not record 'indirect' costs at the contract level in its General Ledger; rather, [Defendant] calculated indirect rates (which it proposed or submitted to the government) that [Defendant] used to allocate its indirect costs across its various contracts (both those at issue in this case and others the company held)" [*Id.* at 21 (citation omitted)]. With respect to Topic No. 13, Defendant states that its "General Ledger does not delineate labor costs by function or role, nor do customary accounting standards require [it] to do so" [*Id.*]. It argues:

> Thus, while Relator maintains that he is entitled to "both costs and testimony about costs" EODT incurred on each of the contracts at issue, he received that testimony to the extent practicable given EODT's time to prepare and the actual obligations imposed on Rule 30(b)(6) witnesses. Even so, EODT proposed that the parties negotiate a stipulation as to certain amounts requested by the Topics, to the extent possible. EODT further proposed to have Ms. Jacobson explain "how to walk through the data" so that Relator and EODT could make those calculations where possible, and later confer regarding the amounts the parties had determined. Indeed, Ms. Jacobson was prepared to, and did in fact, offer testimony walking through the calculations for certain amounts Relator requested, explaining that Relator could ascertain those costs by "look[ing] at the particular contracts or task orders…in the general ledger to see what kind of costs were accumulated," then "trac[ing] . . . invoices into the general ledger . . . ."

[Doc. 273 pp. 21–22 (citations omitted) (alterations in original)].

In addition, Defendant states that Relator mischaracterizes what happened with respect to Topic Nos. 23–27 [*Id.* at 25]. Defendant states that "Relator first became aware of this issue during the examination of 30(b)(6) designee Matt Kaye, which took place earlier that same day" [*Id.*]. "Counsel for EODT explained at that time that EODT had inadvertently informed Relator that Mr. Kaye would address those Topics, which, in turn, caused internal miscommunication and led to neither Mr. Kaye nor Ms. Jacobson being prepared on those few topics" [*Id.* (citation omitted)].

21

Defendant states that "[t]his honest error was borne largely from the sheer volume of material to cover, and upon recognizing it [defense] counsel immediately offered to continue Ms. Jacobson's deposition so that EDOT could prepare her to testify on these [T]opics" [*Id.* at 25–26 (citation omitted)]. Instead, Defendant asserts, Relator filed the motion seeking sanctions [*Id.* at 26]. In any event, Defendant states that it had its "experts . . . evaluate the possibility of responding to Topics 23 through 27" [*Id.*]. Topic Nos. 24 and 27 are "nearly impossible" to testify about and the others "would require significant and costly effort by [Defendant's] experts" [*Id.* (citations omitted)]. In support of its position, Defendant filed the Declaration of its expert, Gregory S. Bingham [Doc. 273-8].

Relator replies that "Ms. Jacobson waited until the deposition was underway to inform Relator's counsel she would not testify as to any 'amount' of costs incurred related to LNs, TNCs, or subcontractors stating counsel told her not [to] 'worry about specific amounts,' and she did not have time because that would involve work" [Doc. 278 p. 5 (citation omitted)]. He asserts that 'if the information is impossible to find or calculate, as [Defendant] contends, then the only testimony at trial of actually incurred labor and subcontractor costs should be that of Plaintiff's witnesses, and [Defendant] should not be allowed to put on, or cross-examine any witnesses regarding what [Defendant's] actually incurred costs were, since it flatly refused to provide such information in discovery" [*Id.* at 9].

Topics Nos. 12–27 generally seek information about Defendant's contract costs and the amount of billings and payments to and from Defendant and its subcontractors [Doc. 262-4 pp. 7–9]. Specifically, they state:

> 12. The amounts and categories of direct, subcontractor, independent contractor, and indirect costs for the Contracts, including for LN, TCN and OCN labor categories.

13.  The costs actually incurred by EODT for each service (*e.g.*, security, demining, labor, translation, life support) performed by LNs, TCNs, and OCNs on the Contracts (if different by month, or changed throughout the duration of the Contracts, please be prepared to testify regarding the date and amount of the change).

14.  The costs actually incurred by EODT for guards, demiters, laborers, or translators furnished by Askars, Al Hurea, and IST on the Contracts, and the breakdown of direct and indirect costs (including fringe benefits, overhead, G&A, and other indirect costs, by dollar amount), and material handling rate, for each subcontractor.

15.  The amount paid by EODT to Askars, Al Hurea, and IST on the Contracts and whether such payments were by cash and documented in EODT's tracking matrix or paid by electronic payment and recorded in the general ledger.

16.  The types of fringe benefits provided, and the costs actually incurred by EODT to provide fringe benefits, to LN, TCN, and OCN guards, demiters, translators, and laborers, on a per head per months basis, on the Contracts.

17.  The types of indirect costs and the breakdown of direct, subcontractor, independent contractor, and indirect costs for the Contracts for LN, TCN and OCN labor categories.

18.  Cost element breakdown of all costs (direct and indirect) incurred for the Contracts (if different than the previous topic).

19.  EODT's knowledge of the direct labor costs and indirect labor cost actually incurred by EODT's subcontractors for LNs, TCNs and/or OCNs for work performed under the Contracts.

20.  The costs that EODT contends Askars, Al Hurea, and IST actually incurred on the Contracts and the breakdown of direct and indirect costs (including fringe benefits, overhead, G&A and other indirect costs, by dollar amount) and material handling rate, for each subcontractor.

21.  The amount of money EODT paid directly to each local national guard, demiter, translator, and laborer, on a per head per month basis, on TOs 5 and 6.

22.     The amount of money EODT paid directly to Al Hurea or Emad Raheem on TOs 5 and 6 on a per month basis and the justification for the payments made (*i.e.*, what did the payment cover).

23.     The amount of money Askars billed EODT for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6.

24.     The amount of money Askars billed IST for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6.

25.     The amount of money IST billed EODT for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6.

26.     The amount of money EODT paid Askars for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6.

27.     The amount of money IST paid Askars for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6.

[Doc. 262-4 pp. 7–9].

During Ms. Jacobson's deposition, she testified that she did not have a specific number to answer Topic No. 12 but that she could calculate a number "[w]ith unlimited time" [Lisa Jacobson Deposition p. 30 ("Jacobson Dep.")]. Ms. Jacobson then explained the process on how to get those calculations, including how to obtain answers for Topic Nos. 13–16 [*Id*. at 30–59]. With respect to Topic 17, she explained that "indirect costs" are "not specific to any one individual contract. . . indirect costs are allocated costs" [*Id*. at 60]. She then testified about the categories of indirect costs [*Id*. at 60–62, 68–69, 73]. With respect to Topic 18, she stated that it is a broader category than Topic No. 17, but that the calculations would be performed in the same manner [*Id*. at 74–75]. She also testified about Topic No. 19, stating that Defendant may have known about

subcontractors' salaries from people talking but that Defendant "did not have a right to OCN, TCN, or LN information if it was provided by a subcontractor" [*Id*. at 75–76]. She also testified on Topic No. 20, explaining that it was not applicable because Defendant was not aware of the actual costs incurred on these contracts by the subcontractors and was not obligated to know these costs given that the contract was a fixed price [*Id*. at 120]. On Topic No. 21, she stated that one "could get to those numbers through looking at what was paid by cash logs, so the vendor would be cash log" and that a search would need to be ran for each category and for each year and then those numbers would need to be added [*Id*. at 80]. On Topic No. 21, she testified that in order to obtain a calculation, the parties could run an accounts payable ledger [*Id*. at 80–81]. During the deposition, the parties ran the report, and Ms. Jacobson explained the numbers and that they would need to be cross referenced using the invoices to ensure that the totals corresponded to the correct month [*Id*. at 84–85].

At the hearing, Relator stated that he had been trying to discover the incurred costs since 2023. He asserted that Ms. Jacobson acknowledged she was not prepared to testify about the specific amounts. Relator argued that Defendant never told him that the costs could not be calculated as part of the Rule 30(b)(6) deposition. With respect to the topics about IST, Relator argued that Defendant's claim that it does not have IST's documents is misleading as Defendant has previously obtained other IST documents from Defendant. Considering that Ms. Jacobson was not prepared to testify, Plaintiff requests that Defendant be barred from any testimony regarding costs. He does not seek to re-depose her on this issue.

Defendant responded that in Relator's reply brief, he seeks to exclude evidence of costs, which is a harsh sanction for what occurred. Defendant argued that the parties merely had a disagreement on what is reasonable for a Rule 30(b)(6) witness to have provided. Defendant stated

that Ms. Jacobson testified that she could perform some calculations with unlimited time and that Mr. Bingham, its expert, explained why the information is not readily available. Defendant argued that its accounting data is not that granular and that it does not track every ONC by name or type of services or by month or day. Further, Defendant argued that Ms. Jacobson testified about how to perform some of the calculations. Defendant noted that the costs are not relevant to this case because they related to a fixed-priced contract. Regardless, Defendant argued, that it believed that Relator would bring to the deposition the general ledger and ask Ms. Jacobson how to find the information, but he did not proceed in that manner. With respect to Relator's allegations about IST documents, Defendant acknowledged that it has produced IST documents but explained that it does not have IST accounting information, which is what was designated.

The parties do not dispute that Ms. Jacobson was unable to testify as to specific numbers. Relator argues that makes her unprepared, and therefore, the Court should prohibit Defendant from referencing costs at trial. Defendant responds that these matters were not reasonably available to it. As noted above, "[A] designee has a duty to reasonably obtain information from corporate documents, current or prior corporate employees, or any other sources reasonably available to the corporation." *Schall*, 2017 WL 4050319, at *5 (citations omitted). After reviewing Ms. Jacobson's testimony on these topics and hearing from the parties, the Court finds that the subject matter was not reasonably available to the corporation. *See DarbeeVision, Inc. v. C&A Mktg., Inc.*, No. CV 18-0725, 2019 WL 2902697, at *10 (C.D. Cal. Jan. 28, 2019) ("[E]ven if documents exist that theoretically could be used to prepare a witness, if the information is so technical or so detailed that even a prepared witness could not be reasonably be expected to keep the information in his or her memory, then the inability to respond may be acceptable."). To be sure, courts have called preparing a Rule 30(b)(6) witness an "onerous task." *Great Am. Ins. Co. of New York v.*

*Vegas Const. Co.*, 251 F.R.D. 534, 540 (D. Nev. 2008). Even so, a deponent may only testify as to information "known" or "reasonably available," *see* Fed. R. Civ. P. 30(b)(6) which appears to the Court to be a fact-intensive inquiry. And here, the Court finds that this information requested in these topics is not reasonably available. In his declaration, Mr. Bingham explains the laborious process to obtain what Relator seeks in these topics. For example, with respect to Topic 13, Mr. Bingham asserts:

> 10.    The requested information is not contained in the EODT GL Data. Although EODT's general ledger delineates labor costs between direct employees and subcontractors, EODT was not required to and did not record costs incurred by function and labor type (e.g., LNs, TCNs, OCNs). Some or all of this information could be contained in invoice documents that were produced in this case. Accumulating this information would be a labor-intensive and manual process that would involve reviewing every subcontractor invoice to identify information related to the function and nationality of each employee that worked on the contract. I estimate it would take approximately 280-360 hours for this effort for all the Contracts.

[Doc. 273-8 ¶ 10]. Mr. Bingham states that "[it] is possible that even after expending this effort, the available documents would not contain detail sufficient to fully answer Relator's Topic 13 request" [*Id.* ¶ 11]. He explains that "on the Rusafa contract, the term 'OCN' is not defined in the solicitation or the proposal, there is no Account code in the GL Data that tracks OCN costs, and the associated supporting documents may not indicate whether an employee is considered an 'OCN' as used in the context of this request" [*Id.*]. He further explains with the other topics:

> 12.    Topic 23 of Relator's 30(b)(6) Notice reads, "The amount of money Askars billed EODT for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6." Although it may be possible to develop information responsive to Relator's request, it would require a meaningful level of effort. EODT's Costpoint accounting system includes records that reflect amounts ultimately incurred for Askars, but EODT was not required to and did

27

not record amounts for each unique TCN guard or security supervisor. Gathering this detail would require [HKA Global, Inc. ("HKA")] to obtain and manually review all the invoices, which would require a significant amount of time. I estimate it would take approximately 100-140 hours for this effort, which would be a subset of the hour estimate for Topic 13 as described in paragraph 10. Further, the amount in EODT's GL Data is the amount incurred by EODT and may be different from the amount Askar billed to EODT (e.g., portions of invoices may have been unpaid).

13. Topic 24 of Relator's 30(b)(6) Notice reads, "The amount of money Askars billed IST for each TCN guard or security supervisor on a per month per head basis, under TOs 5 and 6." Developing information responsive to Relator's request is likely impossible using the available information (e.g., EODT accounting data). The type of information requested would typically be in IST's possession, not EODT's possession.

14. Topic 25 of Relator's 30(b)(6) Notice reads, "The amount of money IST billed EODT for each TCN guard or security supervisor on a per month per head basis, under TOs 5 and 6." Although it may be possible to develop information which is responsive to Relator's request, it would require a meaningful level of effort. EODT's Costpoint accounting system includes records which reflect amounts ultimately incurred for IST, but EODT was not required to and did not record information for each unique TCN guard or security supervisors. Gathering this detail would require HKA to obtain and manually review all the invoices, which would require a significant amount of time. I estimate it would take approximately 25-35 hours for this effort. Further, the amount in EODT's GL Data is the amount incurred by EODT, and may be different from the amount IST billed to EODT (e.g., portions of invoices may have been unpaid).

15. Topic 26 of Relator's 30(b)(6) Notice reads, "The amount of money EODT paid Askars for each TCN guard or security supervisor, on a per month per head basis, under TOs 5 and 6." Although it may be possible to develop information responsive to Relator's request, it would require a meaningful level of effort. EODT's Costpoint accounting system includes records which reflect amounts ultimately incurred for Askar, but EODT was not required to and did not record information for each unique TCN guard or

security supervisor. Gathering this detail would require HKA to obtain and manually review all the invoices, which would require a significant amount of time. I estimate it would take approximately 120-160 hours for this effort.

16. Topic 27 of Relator's 30(b)(6) Notice reads, "The amount of money IST paid Askars for each TCN guard or security supervisor on a per month per head basis, under TOs 5 and 6." Developing information responsive to Relator's request is likely impossible using the available information (e.g., EODT accounting data). The type of information requested would typically be in IST's possession, not EODT's possession.

17. For Topics 15, 21, and 53, the requested calculations would be difficult and time consuming to complete, as it would require HKA to obtain and manually review invoices, and cross-check against other documents such as payment records. I estimate it would take approximately 100-160 hours per request.

[Doc. 273-8 ¶¶ 12–17]. As Mr. Bingham's Declaration sets forth, some of the topics were not answerable while gathering information on the other topics would have taken over 100 hours of effort (12.5 days, if working eight hours a day). Further, although Ms. Jacobson could not provide specific numbers, she did explain how those calculations could be made, and several times during the deposition, she walked Relator's counsel through that process.

Even if the Court were to find that the information was reasonably available to the organization and that Ms. Jacobson was not prepared, Relator's requested sanctions are drastic considering what occurred. At the hearing, Relator confirmed that he did not want to re-depose a Rule 30(b)(6) witness and requested that the Court not allow Defendant "to put on, or cross-examine any witnesses regarding what [Defendant's] actually incurred costs were" [Doc. 278 p. 9]. The two cases Relator relies on, however, do not support such a harsh sanction. *Cf. Zelaya v. Hammer*, No. 319CV00062, 2022 WL 16757086, at *2 (E.D. Tenn. June 27, 2022) (barring the defendant from testifying at trial because he did not appear for his deposition and he failed to fully

29

respond to interrogatories and to request for production and recommending that the district judge consider given an adverse inference instruction to the jury); *Ford Motor Co. v. InterMotive, Inc.*, No. 4:17-CV-11584, 2021 WL 978820, at *12 (E.D. Mich. Mar. 16, 2021) (denying the defendant's request to preclude the plaintiff from introducing designated matters into evidence despite the plaintiff never producing the evidence after being ordered to do so, explaining that such a sanction "would dramatically tilt the playing field"). Granting Relator's requested sanction of barring Defendant from putting on, or cross-examining any witnesses, regarding what Defendant's actual incurred costs were [*see* Doc. 279 p. 9] is entirely disproportionate with what occurred.[5]

### 4.       Sanctions

"[P]roducing an unprepared Rule 30(b)(6) witness is tantamount to a failure to appear, which may warrant sanctions under Fed. R. Civ. P. 37(d)." *Wicker*, 278 F. Supp. 3d at 1000 (citation omitted). "Rule 37(d) provides for a variety of sanctions[,]" including "imposition of costs[.]" *Id.* (quoting *QBE Ins. Corp.*, 277 F.R.D. at 690). If a Rule 30(b)(6) witness is unprepared, courts may order that the deposition be reopened. *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-3785, 2022 WL 3582366, at *5 (S.D. Ohio Aug. 19, 2022).

As an initial matter, the Court has already declined to issue a sanction barring Defendant from putting on, or cross-examining any witnesses, regarding what Defendant's actual incurred costs were [*see* Doc. 279 p 9]. But Relator has requested other sanctions. Relator asserts that sanctions are appropriate here because neither Ms. Graham, nor Ms. Jacobson were prepared to testify [*See* Doc. 262]. He specifically seeks an order that Defendant pay travel costs and attorneys' fees associated with taking the first Rule 30(b)(6) depositions, an award for the costs incurred in his motion, and an order compelling Defendant to produce a prepared Rule 30(b)(6)

---

[5]      The Court further notes that Defendant offered to work with Relator on arriving at a stipulation on the costs incurred. The Court encourages the parties to discuss such a stipulation.

witness within the geographic bounds of the Eastern District of Tennessee [*Id.* at 18–19]. At the hearing, Relator modified his requests, stating that to the extent the Court orders that Defendant be re-deposed, "the easiest time is just to take the seat time that you go take that [Rule] 30(b)[(6)] witness."

Defendant responds that it adequately prepared its Rule 30(b)(6) witnesses [Doc. 273 p. 23]. It details the amount of time Ms. Graham and Ms. Jacobson spent preparing for these depositions and it notes that Relator noticed this deposition when it had limited time to prepare [*Id.* at 24]. Other than the topics that it overlooked (i.e., Nos. 23–27], it maintains its witnesses were prepared and sanctions are not warranted [*Id.* at 25–26].

The Court has already determined that Ms. Graham was not prepared on certain subjects, and therefore, a Rule 30(b)(6) witness must be re-deposed. Further, the parties have to re-depose the Rule 30(b)(6) witness on the OCN topics because Defendant did not prepare a witness due to its pending Rule 72 objection, which is contrary to the law. *City of Holland v. Fed. Ins. Co.*, No. 1:13-CV-1097, 2014 WL 2557124, at *1 (W.D. Mich. June 6, 2014) ("Plaintiffs' position is based on the unsupported and unsupportable assumption that the filing of objections to the magistrate judge's order on a nondispositive matter stays the order's operation. The law is precisely to the contrary."). The Court therefore awards Relator's reasonable attorney's fees for the time it takes to re-depose Defendant. *See* Fed. R. Civ. P. 37(d)(3); *see also ChampionX, LLC v. Resonance Sys., Inc.*, No. 3:21-CV-288, 2024 WL 2224338, at *12 (E.D. Tenn. May 16, 2024) (awarding the plaintiff its attorney's fees for having to redepose the Rule 30(b)(6) witness). Given Relator's partial success on his motion, the Court finds an award of reasonable attorney's fees for motion practice and for the hearing appropriate. *See ChampionX, LLC*, 2024 WL 2223338, at *12. The Court, however, limits the amount of fees to 50% for the motion and the hearing to account for the

partial success. *See id.* (limiting the award to 75% to account for the partial success (citations omitted); *Hamm v. Acadia Healthcare Co., Inc.*, No. CV 20-1515, 2024 WL 1463168, at *11 (E.D. La. Apr. 4, 2024) (reducing the award for attorney's fees because the "motion for sanctions was not wholly successful"). The Court declines to make any further awards.


## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART AND DENIES IN PART** is Relator's Motion to Compel and for Sanctions [**Doc. 262**].

**IT IS SO ORDERED.**

ENTER:

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge